472 F.2d 1
 UNITED STATES of America, Plaintiff-Appellee,
v.
Charles KING, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Manuel RODRIGUEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert BUTLER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ted Dean BUTLER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Vincent ARIAS, Defendant-Appellant.
 Nos. 71-1256, 71-1088, 71-1029 to 71-1031.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 24, 1972.
As Amended on Denial of Rehearing Feb. 7, 1973.
 
 Morris Lavine (argued), Norman J. Kaplan (argued), Barry Tarlow (argued), Eli Blumenfeld (argued), Los Angeles, Cal., for defendants-appellants.
 Irving Prager, Asst. U. S. Atty. (argued), George G. Rayborn, David R. Nissen, Asst. U. S. Attys., Robert Meyer, U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.
 Before BARNES, ELY and WALLACE, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Appellants Robert Butler and Ted Dean Butler (unrelated) were charged both with conspiracy to possess for sale and to sell dangerous drugs (amphetamine tablets and barbiturate capsules) in violation of 21 U.S.C. Sec. 331(q) and 18 U.S.C. Sec. 371, and with conspiracy to conceal, transport and sell heroin, in violation of 21 U.S.C. Sec. 174 and 18 U.S.C. Sec. 371. Appellants Vincent Arias, Manuel Rodriguez and Charles King were charged only in the conspiracy to possess for sale and to sell dangerous drugs.
 
 
 2
 The trial court, after defense motions, severed the trial on the dangerous drug count from the trial on the count relating to heroin. The jury returned a guilty verdict as to each defendant at the conclusion of both trials. Appellants together charge sixty-two errors in this appeal.
 
 TRIAL OF THE BUTLERS ON THE HEROIN COUNT
 
 3
 The Butlers allege error of constitutional dimensions based upon the introduction into evidence of various taped telephone conversations that took place between them and John Durden, a cooperating, unindicted co-conspirator.[1] With Durden's consent, the recordings were made by connecting the telephone he was using with a tape recorder. There is no error. In United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the Supreme Court approved the testimony of government agents who related warrantless electronically monitored conversations between the defendant and a consenting informant, and stated that the Fourth Amendment ". . . affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' " 401 U.S. at 749, 91 S.Ct. at 1125. See also Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); Lopez v. United States, 373 U.S. 427, 438-439, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).
 
 
 4
 The Butlers further contend that their rights to counsel and to be free from self-incrimination were violated by the unseen and unheard monitoring of their conversations. They present the interesting argument that, since Durden was calling them at the request of government narcotics agents, they had a right to be warned of their right to counsel before they spoke, citing Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Appellants have failed to appreciate the rationale of the holdings in those cases. Aside from other reasons at the time of the recorded telephone calls, the record does not demonstrate appellants had been indicted and were represented by counsel as in Massiah; nor are the facts of this case comparable with Escobedo where the investigation had reached the "accusatory" phase, the defendant had been arrested and his request for an attorney denied. In this case, appellants were clearly suspected of criminal activity and were being investigated. To grant a right to counsel under such circumstances, including a right to advice of such a right, would be to mutate a constitutional right into a denial of the right of the public to have criminal activity thwarted. There is no right to counsel while one is committing a crime. Grier v. United States, 345 F.2d 523, 524 (9th Cir. 1965).
 
 
 5
 The Butlers also assert that the trial court committed reversible error by allowing the jury to hear tapes of and simultaneously read transcripts of Durden's half of the recorded conversations, contending that "a great mass of prejudicial hearsay" was thereby allowed into evidence. No particulars of the "great mass" were pointed out by counsel. While it is true that a few of Durden's statements contained narrative statements of events not strictly in furtherance of the conspiracy, none of those statements could reasonably be said to be so prejudicial as to constitute reversible error. The court made a very meticulous effort to excise all such narratives which, in its judgment, could be construed to be irrelevant, and refused to allow the transcripts into evidence, thereby avoiding any potential reinforcement of Durden's half of the conversations. For the Judge to have excised all of Durden's half of the discussions would have rendered the recorded conversations, which were legitimate evidence, unintelligible.
 
 
 6
 Except as indicated later, we find the remainder of the arguments raised by the Butlers regarding the trial on the heroin count to be devoid of merit.
 
 THE DANGEROUS DRUG TRIAL
 
 7
 * All of the appellants claim that they were prejudiced by misconduct of the prosecutor. The principal witness for the government was John Durden who had been caught by federal narcotics agents and apparently decided to cooperate by assisting the agents in their efforts to secure evidence against his fellow conspirators in hopes of receiving lenient treatment for himself.[2] During the course of the trial, Durden's credibility was frequently and vigorously attacked. One of the principal lines of assault comprised asking Durden whether in fact the pending indictment against him was going to be dismissed in consideration of his testimony against the defendants. To this question, he answered "no."
 
 
 8
 Appellants argue that, by allowing such testimony to go uncorrected, the prosecutor was acquiescing in the knowing use of false evidence in the manner forbidden by Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and more recently condemned in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, such an argument is based upon the premise that a promise of dismissal had definitely been made to Durden and that this alleged promise was known to the prosecution. The government has at all times denied such a promise, and there is no evidence in the record to the contrary.
 
 
 9
 As a corollary to their "false evidence" argument, appellants contend that the trial court committed reversible error by not allowing them to argue to the jury that Durden's testimony was not worthy of belief since he had been promised a dismissal if he testified against the defendants. The trial judge stated he would allow counsel to argue that Durden had great expectations of a dismissal as anyone in a similar position would have. Under the circumstances, it was not unduly restrictive to prevent counsel from arguing that a dismissal was in fact forthcoming.
 
 II
 
 10
 All of the appellants challenge the admission into evidence against them of certain items seized by the police: a ledger taken from the purse of Mrs. Rodriguez, the wife of co-defendant Manuel Rodriguez, various scraps of paper with writing thereon taken from a trash container in front of the home of Leo Lovato, an indicted co-conspirator who fled before the trial, and two ledgers and some papers seized from a footlocker found in the garage of Leo Lovato. The bases of attack are that the items were secured by illegal searches and seizures and should have been suppressed and that the items lacked any foundation or authentication and were inadmissible.
 
 
 11
 As to the search of Lovato's trash container and locker, the trial court correctly ruled that the Butlers and Arias lacked standing to move for suppression.[3] Neither the Butlers nor Arias had any proprietary interest in the items in question, nor were they persons against whom the searches in question were directed. Alderman v. United States, 394 U.S. 165, 173-175, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); United States v. Shea, 436 F.2d 740 (9th Cir. 1970); United States v. Toliver, 433 F.2d 867 (9th Cir. 1970), cert. denied, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812 (1971).
 
 
 12
 Regarding the ledger book seized from Mrs. Rodriguez, both appellant Rodriguez and his wife submitted affidavits in connection with the pre-trial motion to suppress, swearing that the ledger book belonged to Manuel Rodriguez. Assuming, without deciding, that Rodriguez did have standing to move to suppress, examination of the circumstances surrounding the seizure reveals that the police did not overstep the bounds set by the Fourth Amendment. Rodriguez was arrested pursuant to information that there was a warrant for his arrest for federal narcotics laws violations. At that time Rodriguez was sitting in a car in a parking lot along with his wife and son; the latter was in the driver's seat. After the arrest of Rodriguez, he and his son were questioned regarding the registration of the vehicle. The son said the car belonged to his father, whereas Rodriguez stated that he had borrowed the vehicle from a friend. A radio check revealed that the license plates on the vehicle were registered to another vehicle. Mrs. Rodriguez and the son were questioned further regarding the vehicle's registration and, upon their failure to give a satisfactory explanation, were placed under arrest for suspicion of grand theft auto. Pursuant to that arrest, Mrs. Rodriguez was subsequently "booked," at which time the contents of her purse were inventoried and the ledger in question was recovered. Even though subsequent investigation revealed that the car was not in fact stolen, it is clear that the officers had probable cause to believe that a crime had been committed by all three of the Rodriguezes, which, of course, provided legal justification for their arrest. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). A warrantless search of personal possessions at the station house pursuant to a valid arrest does not violate one's Fourth Amendment rights. See, for example, Charles v. United States, 278 F.2d 386, 388 (9th Cir. 1960).
 
 
 13
 Counsel for Rodriguez cites Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), arguing that the arresting officers could not base their arrest of Rodriguez upon the mere report received via radio that there was an outstanding warrant for Rodriguez's arrest. In Whiteley, a sheriff had secured an arrest warrant based on his own conclusory statement that Whiteley had broken and entered a building, and then radioed a bulletin containing a description of the suspect, of the car he was driving, and of the amount and type of money he was suspected of taking. Acting on the bulletin, an officer arrested Whiteley, searched his car and recovered damaging evidence against him. The Supreme Court held that the warrantless arrest based upon the radio bulletin could not supply the element of probable cause that the sheriff issuing the bulletin lacked, and so ruled that the seized evidence should have been suppressed.
 
 
 14
 Here, at the time of Rodriguez's arrest, there were two valid arrest warrants outstanding. One was issued by the district court pursuant to the return of an indictment charging Rodriguez with the crime of which he was ultimately convicted, and the other issued by a magistrate upon an affidavit which adequately set forth the facts underlying the charging officer's conclusions, and so were sufficient to support an independent judgment that probable cause existed for Rodriguez's arrest. See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).
 
 III
 
 15
 Aside from the question of the search, it is argued that all of the items seized lacked any foundation or authentication and so were inadmissible against the appellants. The government failed to present any proof that the writings were in the handwriting of any of the appellants, or of when the writings were made.
 
 
 16
 It is the function of the trial court to determine whether proffered evidence has enough prima facie trustworthiness to warrant its consideration by the jury, and generally the sufficiency of a showing of authenticity of a writing sought to be introduced into evidence is a matter within the discretion of the trial judge. Arena v. United States, 226 F.2d 227, 235 (9th Cir. 1955). Appellants insist that the mere contents of a writing which is purported to be authored by a particular person are insufficient evidence of genuineness. See 7 J. Wigmore, Evidence Sec. 2148 (3d ed. 1940). However, circumstances extrinsic to the document may point with sufficient certainty to the person or persons who created it to allow the jury to consider the document. See, for example, United States v. Sutton, 138 U.S. App.D.C. 208, 426 F.2d 1202, 1207 nn. 34-36 (1969) and cases cited therein.
 
 
 17
 When Leo Lovato was placed under arrest at his residence, and in response to inquiry about dangerous drugs, he pointed out to the officers the location in his attached garage where the drugs could be found. The drugs were in boxes and a footlocker, the latter also containing two ledgers and various papers. The contents of the ledgers lead one to the obvious conclusion that they were records of a drug business. One of the ledgers seized from Lovato's locker appears to contain a running account of distribution to the co-conspirators; under each of their names, each entry is dated, units of "R" and "W" or in some cases "Reds" and "Whites" are recorded, and dollar amounts are noted next to the entries. The other ledger contains similar notations, but with the additional entries of, e. g., "C#1," "C#2," etc., "Pd $20 tip C#8," "Pd $250 to driver" and "Pd in full." Similar notations were contained on the slips of paper found in Lovato's footlocker. Also, some of the entries corresponded exactly with transactions about which there was independent evidence in the form of tape-recorded conversations and testimony of John Durden. Considering the reality that proof of conspiracies must often rely heavily upon circumstantial evidence [See Diaz-Rosendo v. United States, 357 F.2d 124 (9th Cir.), cert. denied, 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966), and Davenport v. United States, 260 F.2d 591, 598 (9th Cir. 1958)], and given the circumstances of this case, we find ourselves in agreement with Professor McCormick:
 
 
 18
 Should not the practice of accepting as prima facie genuine a document which comes from a natural custody be extended beyond the field of public duty, and be recognized for writings found in private custody? It seems that it should, but that here the practice should be discretionary and that if the judge finds that the purport of the writing and the fact that it was found in a place and custody natural for such a paper, and the other attending circumstances, make its genuineness substantially probable, it should come in.[4]
 
 
 19
 The same conclusion was reached in People v. Ramsey, 83 Cal.App.2d 707, 189 P.2d 802 (1948) in dealing with a similar situation. At defendant's home, where an alleged abortion occurred, a looseleaf notebook was found in a cupboard beside a telephone where an appointment book would usually be kept. The notebook contained entries showing a date, time, name, address and telephone number which were consistent with the alleged abortion. The court ruled that the notebook was admissible, despite the fact that neither authorship nor when the entry was made was shown.
 
 
 20
 Since the ledgers and other papers taken from Lovato's footlocker are technically hearsay, an alternate theory of admissibility is that they constituted an admission by Lovato. Here, Lovato in effect identified the documents as his own by directing the agents to his "business storeroom" where they were found with his contraband merchandise. The circumstances here provide a much more reliable index of genuineness than, for example, an unsigned letter found on a defendant's premises with no independent evidence to demonstrate a meaningful connection. See Poy Coon Tom v. United States, 7 F.2d 109 (9th Cir. 1925).
 
 
 21
 Admissibility as to Lovato does not end the inquiry-the question of admissibility as to appellants remains. However, the trial judge properly instructed the jury that, if they found a conspiracy did exist and that a defendant was a member of the conspiracy, then the statements and acts of those found to be members of the conspiracy (as Lovato) may be considered by the jury as evidence in the case as to any defendant found to have been a member, provided such statements or acts were knowingly made or done during the continuance of the conspiracy, and in furtherance of some object or purpose of the conspiracy. In this case, the evidence was overwhelming that a dangerous drug conspiracy and a heroin conspiracy did exist, and the majority of the testimony, including the tape-recorded evidence in both the dangerous drug case and the heroin case could easily have supported a finding by the jury that Leo Lovato was a member of each of the conspiracies. The contents of the ledgers and other papers appear on their face to have been written during the course of the conspiracy and in furtherance of the objects of the conspiracy. Such evidence, coupled with the independent evidence of each of the defendants' participation in the conspiracy[5] was sufficient to allow the jury to consider the ledgers and other papers taken from Lovato's footlocker as to each defendant.
 
 
 22
 The scraps of paper taken from the trash of Lovato do not qualify under either of the rationales used to admit the ledgers and other papers taken from the footlocker. There is a great difference between a defendant identifying to arresting officers the whereabouts of contraband and records of contraband transactions and merely finding discarded memoranda in a person's trash. The nature of the contents of the scraps recovered from the trash also leaves much to be desired as far as providing circumstantial evidence of their genuineness. Most of them apparently contain no more than doodles, unrelated telephone call messages (e. g., "Johny will call back") and lists of numbers with letters beside them which could easily be taken as reflections of transactions merely contemplated rather than records of transactions actually planned or completed. We, therefore, hold that the admission of the scraps of paper recovered from Lovato's trash was error. However, in view of the other evidence in the case, the error was harmless.[6]
 
 
 23
 We take a similar view of the introduction in the dangerous drug trial of the ledger book seized from the wife of Rodriguez. Only twelve of the seventy-five pages of the book contained writings which the trial judge deemed sufficiently relevant to admit into evidence, and even those pages present a rather sketchy and confusing picture. It is unnecessary to reach the question of the admissibility of the ledger because, as stated above, any error could only be harmless.
 
 IV
 
 24
 Rodriguez complains that some of the tapes that were heard by the jury contained prejudicial statements; the primary complaint is with respect to a statement by Joe Lovato that "He'll [referring to Rodriguez] go tonight and kill somebody, or something." We hold that the admission of such a statement was not reversible error for two reasons. First, taken in context, it is highly unlikely that the jury could have understood the statement to mean that Rodriguez was actually going to commit murder. The full statement was, "The other thing is that Manuel, they don't play with Manuel and Manuel might get in some trouble you know, that way. He'll go tonight and kill somebody or something." It seems apparent that Joe Lovato was merely trying to communicate that Manuel (Rodriguez) was a bit too impulsive to stay out of trouble as far as some were concerned, so that he was not to be trusted fully. The second reason is that the trial judge immediately instructed the jury to disregard the statement about killing. In our view, the combination of these two factors made the error, if there was any, harmless.
 
 V
 
 25
 All of the appellants argue that the evidence taken in the light most favorable to the government showed the existence of multiple conspiracies rather than a single conspiracy and that, therefore, the judge committed reversible error by refusing to instruct the jury on the possibility of finding multiple conspiracies. Principal reliance is placed upon Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), where the Supreme Court found that only one of the defendants had participated in a number of separate and distinct conspiracies with a number of different individuals, and so there was no conspiratorial nexus tying all of the defendants together in a conspiracy common to all. The rationale of the decision was that it was highly prejudicial to the defendants to allow all the evidence of the separate crimes to be introduced against all of the defendants to prove a single crime.
 
 
 26
 We think that this case is controlled by the law set forth in Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). In that case, three salesmen separately agreed to distribute illegal whiskey for two other defendants, who had an agreement between themselves; no salesman knew or had any dealings with any other salesman and each was geographically far from the others. The Court distinguished the Kotteakos case and found that only one conspiracy existed:
 
 
 27
 By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal. 332 U.S. at 558, 68 S.Ct. at 257.
 
 
 28
 Here, the evidence was very persuasive that most of the coconspirators not only knew of the others, but that all knew of and participated in the illegal plan of distribution of the amphetamines and barbiturates. Under such circumstances, we hold that it was not error for the trial court to refuse to give an instruction on the possibility of finding multiple conspiracies.
 
 VI
 
 29
 During the course of the trial, some of the attorneys for the defense were occasionally excused for short times to attend to other matters. Each time, other counsel agreed to represent the interests of the absent attorney's client. Appellant King contends that such occasional "pinch hitting" deprived him of his right to counsel, or at least of his right to effective assistance of counsel. However, no objections were made by King during the course of the trial to this procedure; on the contrary, he specifically consented to it the two times that his counsel was absent. Although such a practice may be questioned, it is well settled that where, as here, there was no plain error, one may not raise on appeal that to which he did not object at trial. United States v. Markham, 440 F.2d 1119 (9th Cir. 1971); White v. United States, 315 F.2d 113 (9th Cir.), cert. denied, 375 U.S. 821, 84 S.Ct. 58, 11 L.Ed.2d 55 (1963); Grant v. United States, 291 F.2d 746 (9th Cir. 1961).
 
 
 30
 We find the remainder of appellants' argument to be without merit.
 
 
 31
 Affirmed.
 
 
 
 [1]
 Appellant King asserts the same error was committed in his trial involving dangerous drugs
 
 
 [2]
 The Butlers and Rodriguez assert in their briefs, and the government has not denied, that about two months after the convictions challenged here, the indictment against Durden was dismissed by the government
 
 
 [3]
 Rodriguez also moved to suppress the material taken from Lovato's footlocker. Apparently the trial judge never ruled on Rodriguez's motion
 
 
 [4]
 C. McCormick, Evidence Sec. 191, p. 403 (1954). See also 7. J. Wigmore, Evidence Sec. 2160 n. 4 (3d ed. 1940), and cases cited. Wigmore is cited as sole authority in United States v. Imperial Chemical Industries, Ltd., 100 F.Supp. 504, 513 (S.D.N.Y.1951)
 
 
 [5]
 Taken in the light most favorable to the government (Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)) the other evidence with respect to the dangerous drug conspiracy was as follows:
 Amphetamines and barbiturates in the form of pills were packaged in plastic bags, which were concealed in the paneling of cars, and the "load" cars were driven across the border to various places, apparently at the direction of Joseph Damian Lovato (hereinafter "Joe Lovato"). Also at the direction of Joe Lovato, generally defendant Hilaria Aguilar, known as "Rosa," would call Durden and tell him where to pick up an incomcoming load car.
 Durden would then pick up the load car, dismantle it to retrieve the contraband, hide the contraband, and return the load car to the same place it was picked up. Then Durden would generally check back with Rosa, who informed him to whom he was to distribute the drugs, apparently on a consignment basis.
 According to Durden's testimony, he first met Manuel Rodriguez in the company of Joe Lovato. Joe Lovato asked Durden to hold some drugs for him while he (Joe) made a trip into Mexico, to which Durden agreed. Manuel Rodriguez then took thirty bags of "reds," each containing five thousand pills, from his own car and placed them in the trunk of Durden's car.
 Durden also testifed that he distributed loads of pills to Manuel Rodriguez on a number of occasions. Durden also testified that Rodriguez had supplied Durden with pills.
 According to the testimony of narcotics Agents Sternaman and Tarallo, while surveiling the residence of Joe Lovato, Rodriguez was seen in the company of Vincent Arias, exiting Lovato's residence, Rodriguez and Arias drove away together, went into a restaurant and returned in a while to Lovato's residence. While the two were at the restaurant, a dark brown ledger was observed by Agent Tarallo on the seat of the vehicle the two were in.
 A fellow employee of Rodriguez testified that Rodriguez got up abruptly from an interview at his company's personnel office upon sighting a police car through the window and trotted away. The officer who arrested Rodriguez confirmed the testimony regarding his attempted flight.
 A fingerprint expert testified that Rodrequez's fingerprints appeared on four separate pages of a ledger book recovered from the purse of his wife, who was also arrested with Rodriquez. Agent Tarallo testified that the same ledger book was the one he had earlier seen on the seat of the vehicle which Arias and Rodriguez had taken to the restaurant from Joe Lovato's residence.
 The ledger book taken at Rodriguez's arrest contained lists of "R" and "W" ("Whites" is a term which also is used in that exhibit) under peoples' names, dated within the period of the conspiracy. These dates substantially coincided with the dates of deliveries to Leo Lovato as evidenced by the latter's ledgers.
 Agent Sternaman testified that on April 1, 1970, he and Agent Clemente arrived as Manuel Rodriguez was being booked into jail. He examined the ledger book which had been taken from Mrs. Rodriguez, told the jailers of his interest in it as evidence and of his intention to take it later. Sternaman thereupon advised Rodriguez of his rights and ascertained that Rodriguez understood these rights. Sternaman, while leafing through the book, asked Rodriguez what the "W" and "R" stood for. Rodriguez responded by smiling and shrugging. When asked if the letters stood for drugs, Rodriguez shrugged and smiled faintly again. (The court instructed that the jailhouse interview testimony was to be taken only as to Rodriguez.)
 Durden testified that Arias received five separate loads of amphetamines and barbiturates, totalling nearly a million pills from Durden from the middle of August through the first week of September, 1969. Durden also testified that Arias called him several times during the period of the conspiracy and inquired as to whether Durden had anything on hand.
 Durden testified that Charles King came to Durden in June, 1969, and received twenty thousand or twenty-five thousand reds. Two more loads of five thousand or ten thousand pills were distributed by Durden to King in August, 1969.
 In a taped telephone conversation between Durden and Robert Butler, in response to inquiry by Durden as to whether Lovato would have "something" for Durden, Butler replied, "He's all empty . . . he only got those 30, 30, 35 I think. The ones he got from those other people. And he hasn't got anything in since then. He bought these from another source and these people charged him 5 over what he normally was going." Robert Butler also stated to Durden, "I told him I'm going over there with him next time . . . trip coming up here you know."
 In another conversation with Durden, Robert Butler asked Durden whether he could get some older model cars for Joe Lovato and Robert Butler.
 Durden testified that he had seen Robert Butler at one time accompanying Joe Lovato, and that there was conversation between Butler and Lovato about load cars. In response to a statement by Lovato that another load car would be in that night, Butler replied that he wanted either one hundred thousand or two hundred thousand "reds" and thereafter engaged in a conversation with Lovato about such a drug transaction. Lovato then made a telephone call, asking the other party whether there were "20 big ones or 20 pillows" available. Shortly thereafter, Leo Lovato arrived and immediately left with Robert Butler. Soon thereafter, Leo and Robert Butler returned, whereupon Butler made a telephone call and asked for money and said, "I have got the stuff."
 Ted Butler was accompanying Durden when he was arrested by undercover Agent Sternaman for attempting to sell Sternaman fifty thousand reds and fifty thousand whites.
 In their jail cell, Durden explained Lovato's dangerous drug operation to Ted Butler. Butler expressed to Durden that he had not previously been aware of what had actually occurred but that as long as he was involved now, he would like to get fully involved in the operation. Durden had not proposed that Ted Butler get involved; Butler volunteered.
 The day after Durden and Ted Butler were released from jail, they went to a telephone booth and, with Ted Butler waiting in the car, Durden called Joe Lovato. When Lovato told him there was another car in, Durden told him he would call back. Durden then told Ted Butler about the car and suggested that they find some place new to store the load; Butler agreed. The two men drove to another person's house to find if they could keep the drugs there, but the individual was not there. Since they were leery that agents might be following them, Durden decided that it would be best not to store this load.
 The weekend after Durden was released from jail, he met with Joe Lovato and Vincent Arias and told them that Ted Butler had been arrested with Durden. Ted Butler soon became involved with Lovato in acquiring dangerous drugs. Ted Butler once presented Durden with $580 to pay to Joe Lovato as one payment for Butler's prior acquisition of twenty thousand barbiturates. The total payment was $1,100; Butler had previously paid Lovato $520.
 On November 19, 1969, Durden called Joe Lovato. Lovato told Durden that there were three barrels of reds and one of whites across the border which he wanted somebody to go down and pick up. Lovato wanted Durden to get a car in which to "hide them". Durden called Ted Butler, who stated that he would pick up the load with Durden.
 The independent evidence of participation in a conspiracy to conceal, transport and sell heroin by the Butlers is similarly persuasive. Durden testified that when he first met Robert Butler through Joe Lovato (who was indicted but failed to appear for trial) on October 30, 1969, heroin trade was discussed. The same subject was discussed by Robert Butler and Durden alone again the next day, and Robert Butler said that he would have to "go back to Ohio" to get a sample due to the poor quality supplied by Joe Lovato.
 Durden was present on November 3, 1969, when Robert Butler and Joe Lovato met to discuss the purchase of heroin. A small purchase was made by Robert Butler, and arrangements were made by Butler to buy more "if the stuff was good."
 About December 8, 1969, Durden talked with Robert Butler about his recent trip east. Later on that day, Joe Lovato, Robert Butler and Durden had a conversation at the Torch Club about "eastern business." Durden and Robert discussed the heroin Butler was to get to take east in monitored telephone calls, which were played at the trial.
 Durden testified to several conversations between Joe Lovato and Robert Butler wherein Robert and Durden agreed to help Joe find "load cars"-old automobiles that could be used to transport heroin from Mexico into the United States without losing too large a sum if the smuggling was caught and the cars confiscated. Robert Butler delivered keys for such a car to Lovato.
 Another meeting between Joe Lovato and Butler, with Durden present, produced further details of Robert Butler's distribution of Lovato's heroin in several eastern cities. It was one of Robert Butler's functions, along with Durden, to acquire the load cars to enable Lovato secretly to smuggle heroin from Mexico.
 Ted Butler, in December, 1969, called Durden relaying Lovato's desire to get back some heroin mistakenly given to Durden. Leo Lovato once gave Ted Butler two ounces of heroin for Durden. Butler held this heroin for a period of time and finally sold it. This transaction was supported by Ted Butler's recorded telephone conversation in December which showed that he had received some heroin from Leo Lovato. Later, in a recorded conversation, he said he had sold two ounces of heroin to a person named Thomas King.
 
 
 [6]
 See text at note 5, supra. Furthermore, the ledgers from Lovato's footlocker provided additional strong circumstantial evidence