**UNITED STATES of America,**
**Appellee,**

v.

**Jim Ladesma [LEDESMA], Appellant.**

**UNITED STATES of America,**
**Appellee,**

v.

**Oscar Venicio QUIROZ–SANTI,**
**Appellant.**

**Nos. 73–1583, 73–1582.**

United States Court of Appeals,
Ninth Circuit.

May 21, 1974.

---

38

Martha Goldin (argued), Alan Saltzman, of Saltzman & Goldin, Hollywood, Cal., for appellant in 73–1583.

Michael Kenney, Asst. U. S. Atty. (argued), Los Angeles, Cal., for appellee in 73–1583.

Carl E. Stewart (argued), of Eilers, Stewart, Pangman & Millar, Newport Beach, Cal., for appellant in 73–1582.

Michael Kenney, Asst. U. S. Atty. (argued), D. Henry Thayer, Eric A. Nobles, Asst. U. S. Attys., William D. Keller, U. S. Atty., for appellee in 73–1582.

## OPINION

Before HUFSTEDLER and GOODWIN, Circuit Judges, and THOMPSON,* District Judge.

ALFRED T. GOODWIN, Circuit Judge:

Jim Ledesma and Oscar Venicio Quiroz-Santi appeal their convictions for conspiring to possess and distribute cocaine in violation of 21 U.S.C. § 846 and for possessing, with intent to distribute, cocaine in violation of 21 U.S.C. § 841(a)(1). They assert errors in the admission of evidence and also seek reversals for insufficiency of the evidence. We affirm both convictions.

In November, 1972, Nancy Pena of North Hollywood, California, received a letter from her adopted sister, Isabelle Soto, an unindicted co-conspirator living in Chile. Soto requested a telephone number at which Pena could be reached. Pena had no telephone of her own, so she sent Soto the number of a friend and neighbor, Dora Acerbi. Beginning early in December, Pena received a series of calls on Acerbi's telephone from Soto, in which the two discussed Soto's plan to visit Pena in Los Angeles. Later, Soto canceled these travel plans, but said that instead, she would be sending presents for Pena's children.

On December 1, 1972, a trunk from Chile arrived at the Los Angeles airport addressed to Pena. A routine customs inspection revealed over 22 pounds of cocaine concealed under a false bottom in the trunk. When Pena arrived at the airport to claim the trunk, she was arrested by Customs agents. After deciding that Pena probably had no knowledge of the cocaine smuggling, the agents sought and received her cooperation in their investigation. At their request she called Soto in Chile to report the arrival of the trunk. Soto called

---

* The Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

back later that day to advise Pena to save the trunk until she could reclaim it. Both these conversations were recorded by the government, with Pena's permission.

Meanwhile, Customs Agents removed most of the cocaine and replaced it with a filler that resembled cocaine, leaving only a sufficient quantity of the drug to serve, if needed, as evidence.

On December 8, Pena received another call from Soto in which Soto told Pena that two men, whose names were Benevadas and Castro, would pick up the trunk shortly.

On the afternoon of December 11, Pena's neighbor, Acerbi, received a telephone call from Ledesma seeking Pena's new address. Acerbi gave Ledesma the address, and that evening Ledesma arrived in a taxi at Pena's apartment. Quiroz-Santi followed Ledesma in a rented automobile, and remained in his car. After undercover agents had returned with the trunk, it was loaded into Ledesma's waiting taxi. Ledesma, still followed by Quiroz-Santi, then returned to their motel room in Hollywood. The trunk was stored in the room, and Ledesma and Quiroz-Santi left the motel and did not return until early the next morning.

That afternoon, after Quiroz-Santi had bought a lock for the trunk, he and Ledesma took the trunk to a railway-express office and arranged to have it shipped to Ledesma, under an assumed name, in New York City. Ledesma and Quiroz-Santi were arrested that evening. Customs agents also seized the trunk at the railroad station. Two days later, with a search warrant, the agents searched the trunk and discovered that the false bottom and the concealed cocaine had not been disturbed.

Ledesma and Quiroz-Santi testified in their defense. They said they had come from New York on a vacation and had met a man in a cocktail bar who asked them to pick up a trunk of his from a friend and to send it on to New York. He agreed to pay Ledesma $150 and to assist him in finding a rent-controlled apartment back in New York in exchange for Ledesma's assistance. Ledesma consented. Quiroz-Santi did not take an active part in the conversation, but did assist Ledesma in claiming and attempting to forward the trunk. Both Ledesma and Quiroz-Santi denied any knowledge that cocaine was hidden in the trunk.

Both defendants object to the admission in evidence of the trunk and the cocaine contained within it, and of the recorded conversations between Soto and Pena. Both also claim that in any event the evidence was insufficient to support their convictions.

## I. The Trunk

Although the trunk was not searched the second time until after a search warrant had been obtained, it was lawfully seized by government agents at Customs, and remained subject to governmental seizure and control thereafter while it was being used as bait. *See* 21 U.S.C. § 881(a)(3).

■ There was no prejudicial error in refusing to grant Quiroz-Santi an evidentiary hearing on his motion to suppress. Rule 41(e), Federal Rules of Criminal Procedure, provides that the court "shall receive evidence on any issue of fact necessary to the decision of the motion." Evidentiary hearings need not be set as a matter of course, but if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question, an evidentiary hearing is required. Cohen v. United States, 378 F.2d 751, 760–761 (9th Cir.), cert. denied, 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967).

■ In the present case we need not decide whether Quiroz-Santi's motion met the *Cohen* standard. Although a pretrial evidentiary hearing could have been conducted, the Customs agents involved in the seizure testified at the trial. Quiroz-Santi examined them thor-

oughly on the circumstances surrounding the surveillance of the defendants and the trunk. While the practice of consolidating the suppression hearing with the trial is not to be commended in all cases, the defendants here were not prejudiced by the denial of a separate hearing, and no reversible error occurred.

■ As property subject to forfeiture, *see* 21 U.S.C. § 881(a)(3), the trunk was properly seized by Customs agents when they took possession of it from the railway-express office at which it had been left. *See* 21 U.S.C. § 881(b)(4); *cf.* Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). Although we need not decide whether the agents could have entered a private residence without a warrant in order to seize the trunk, we have no difficulty in holding that they acted properly in seizing a trunk, known to have been used to smuggle cocaine, from a railroad shipping office. Since the seizure was legal, the motion to suppress was correctly denied, and the trunk and its contents were properly admitted into evidence.

## II. The Soto-Pena Conversations

Ledesma and Quiroz-Santi also objected on hearsay grounds to the admission of testimony and transcriptions of telephone conversations between Nancy Pena and Isabelle Soto. The government counters by arguing that Soto's statements were properly admitted as those made by a co-conspirator during the course of the conspiracy.

■ Before out-of-court conversations of a co-conspirator may be used as evidence against a defendant, there must be proof from a source apart from the statement: (1) that a conspiracy existed, and (2) that the member against whom the conversation is introduced had knowledge of and participated in the particular conspiracy alleged. *See* Glasser v. United States, 315 U.S. 60, 75, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Spanos, 462 F.2d 1012, 1014

(9th Cir. 1972); United States v. Bentvena, 319 F.2d 916, 949 (2d Cir. 1963). In United States v. Griffin, 434 F.2d 978, 983–984 (9th Cir. 1970), cert. denied sub nom. Andrews v. United States, 402 U.S. 995, 91 S.Ct. 2170, 29 L.Ed.2d 160 (1971), we quoted with approval from United States v. Ragland, 375 F.2d 471 (2d Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968), where Judge. Waterman of the Second Circuit wrote:

" * * * [O]nce some conspiracy, agency or concert of action is independently shown * * *, hearsay statements made in furtherance of such relationship * * * are admissible. However, the independent evidence need not, as appellant suggests, be so clear and convincing as to *compel*, absent contradiction, a finding of the fact sought to be proved.

"The threshold requirement for admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant although it might later eventuate that the independent evidence so admitted proves to be insufficient to justify submitting to the jury the issue of defendant's alleged guilty involvement with declarant * * *. In determining preliminary questions of fact relating to admissibility of the hearsay the trial judge has wide discretion * * * and need only be satisfied, if he accepts the independent evidence as credible, that that evidence is sufficient to support a finding of a joint undertaking * * *.

"Moreover, the independent evidence of illicit association may be totally circumstantial * * *. Nor is it necessary in this circuit that such independent evidence be inconsistent with all reasonable hypotheses of innocence, as appellant suggests, * * * to legitimate its admissibility * * *." 375 F.2d at 476–477. (Emphasis in original.)

■ The foundation evidence here meets this standard. First, there was

independent proof that a conspiracy existed. We note that the 22 pounds of cocaine contained in the trunk was the equivalent of some 100,000 dosages and had a street value in excess of $900,000. These facts, along with shipment of the trunk from Chile to Los Angeles, where it was claimed first by Pena and then by two strangers, are sufficient to establish the existence of a conspiracy of two or more persons to possess and distribute cocaine.

There must also be some independent proof of each defendant-conspirator's knowledge of and participation in the conspiracy. Both defendants argue vehemently that this kind of evidence was lacking. They concede that they picked up a trunk at Pena's apartment and shipped it to Ledesma in New York, but they contend that there is no evidence from which it can be inferred that they knew that the trunk contained cocaine. The appellants conclude that, without such knowledge of the principal purpose of the conspiracy, Soto's hearsay statements cannot be admitted against them.

We will note briefly some of the evidence on which a finding of requisite knowledge could have been based. Pena's neighbor testified that Ledesma had told her that he had obtained her telephone number by calling Soto in Chile. From this telephone call, an inference could properly be drawn that Ledesma participated in or even knew of Soto's illegal plan. We are not convinced by Ledesma's attempt to deny the appropriateness of an unfavorable inference by invoking the rule that mere association with guilty persons is insufficient to establish intentional participation in a conspiracy. *See* United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128 (1940). In view of the inconsistency between Ledesma's telephone call and Ledesma's explanation of his involvement with the trunk, the judge had the right to disbelieve the defendants' story of how they flew from New York to California because Quiroz-Santi had had a fight with his wife and then happened to meet a stranger in a bar who paid them money to pick up a trunk of his and ship it to New York. The court was entitled to infer that Ledesma and Quiroz-Santi did not fly across the country and devote a substantial amount of their time and money on the west coast in locating and shipping a stranger's trunk, about which they knew nothing. It was far more likely that Ledesma and Quiroz-Santi were at least partially-informed members of the conspiracy, whose job it was to forward the trunk from Los Angeles to New York. Also, Ledesma used a false name and carried false identification; Quiroz-Santi used a different address for his residence when renting an automobile than when registering at the motel; Quiroz-Santi followed Ledesma's taxi over, to Pena's apartment, parked a block away, and waited in the darkened car with a newspaper in front of his face; Ledesma, when picking up the trunk at Pena's apartment, did not mention that he was sent by a stranger whom he had met the previous night, but said that he himself needed the trunk to send clothes back to New York.

There was sufficient independent evidence that Ledesma and Quiroz-Santi had knowledge of and participated in the conspiracy to distribute cocaine to justify admitting the hearsay statements of Soto.

Quiroz-Santi also argues that even if Soto's half of the conversation is admissible under the co-conspirator exception to the hearsay rule, Pena's half still is not admissible since she was little more than a government agent. A similar problem was met in United States v. King, 472 F.2d 1 (9th Cir. 1973). What was said there is every bit as applicable here:

"* * * For the Judge to have excised all of * * * [Pena's] half of the discussions would have rendered the recorded conversations, which were legitimate evidence, unintelligible." 472 F.2d at 5.

Moreover, Pena was present at the trial and was subjected to rigorous cross-ex-

amination by both defendants. Under these circumstances we find that most of the justifications normally relied upon for excluding hearsay did not exist here. *See* C. McCormick, Evidence 581–83 (2d ed. E. Cleary 1972).

Finally, Ledesma contends that because two of the conversations took place on December 5, 1972, and the indictment charges that the conspiracy began "on or about December 8, 1972," these conversations were inadmissible as predating the existence of the alleged conspiracy. This court has previously rejected the notion that the beginning of the conspiracy must be specifically proved:

> " * * * Speaking generally, the government had no knowledge of the exact time or place of the formation of the conspiracy, and to require it to specify the particular time and place, and limit the proof to that time and place, would defeat almost every prosecution * * *." Toliver v. United States, 224 F.2d 742, 744 (9th Cir. 1955).

*See also* Heike v. United States, 227 U.S. 131, 145, 33 S.Ct. 226, 57 L.Ed. 450 (1913).

### III. Insufficiency of the Evidence

Both Ledesma and Quiroz-Santi contend that there was insufficient evidence to support their convictions. They again argue that the evidence proved only that they took into their temporary possession a trunk which happened to contain smuggled cocaine. Proof that they knew of the cocaine, they contend, was entirely absent.

We agree that there was no direct evidence of knowledge. However, the same circumstantial evidence which we reviewed in connection with the foundation for the telephone calls could cause a jury to infer that the defendants knowingly entered into a conspiracy to possess and distribute cocaine. We recognize that the independent evidence called upon to justify the admission of Soto's statements against Ledesma and Qui-

roz-Santi may be sufficient for that purpose yet insufficient to support their convictions. *See* United States v. Ragland, 375 F.2d at 477. Here, however, the independent evidence, along with Soto's statements, was sufficient to sustain the jury's verdict.

Some of the evidence from which a jury could infer that the defendants knowingly took part in a conspiracy to possess and distribute it, may bear repeating here: (1) The defendants left New York one day after Soto had told Pena that two men would be coming shortly to pick up the trunk; (2) the day after their arrival in Los Angeles they began their efforts to locate the trunk; (3) they invested a substantial amount of time and money in locating and shipping an apparently empty trunk; (4) when Ledesma left a note with Pena's child at school to be delivered to Pena, he used an alias rather than his own name; (5) Pena's neighbor and a federal agent disguised as her friend both testified that Ledesma had said that he had gotten her telephone number, a number known only to a very few people, by calling Pena's relative in Chile; (6) Pena and the disguised federal agent both testified that Ledesma was very nervous when he came to pick up the trunk; and (7) Pena's neighbor testified that when Ledesma found that the trunk was not at Pena's apartment he got angry and asked, "How is it possible that this lady has given the trunk to somebody else when her sister had told her to keep it here?"

Since Quiroz-Santi argues that the evidence was especially slim against him, we think it appropriate to deal with him separately. Concededly, Ledesma appeared to take the more active role in moving the trunk along its way. The evidence, however, supports the inference that Quiroz-Santi's apparent disassociation with the venture did not reflect his innocence but rather his desire to insulate himself from criminal liability. For example, rather than join Ledesma in the taxi ride over to Pena's

apartment, Quiroz-Santi chose to follow in a rented car. The jury could quite properly reject Quiroz-Santi's explanation for this curious behavior and instead view it as part of an attempt to avoid being seen in Pena's residence with Ledesma and the trunk. Moreover, Quiroz-Santi parked in a darkened automobile outside the apartment building, with a newspaper in front of his face. Apparently curious at the source of Ledesma's delay, he cruised in front of the apartment once and returned to a parking place a block from the building. On another occasion Ledesma made a telephone call to Pena's neighbor seeking Pena's address. When she had difficulty understanding Ledesma, Quiroz-Santi, who was standing by, took over the telephone from Ledesma and arranged the meeting for that evening. This behavior, along with the other evidence we have cited, was sufficient to sustain the jury's verdict against Quiroz-Santi.

█ Both Ledesma and Quiroz-Santi object to the government's suggestion that the jury's disbelief of their testimony can somehow buttress deficiencies in the government's evidence. Although the government clearly has the burden of proof to establish guilt beyond a reasonable doubt, and although the defendants clearly have the right to elect not to testify, if they do testify, a jury may properly base its finding in part on the defendant's testimony and their disbelief in its truth. *See* United States v. Chase, 503 F.2d 571, at 573 (9th Cir., 1974); United States v. Hood, 493 F.2d 677, at 681 (9th Cir. 1974).

Here, Ledesma and Quiroz-Santi, at least one of whom indicated at one point that he was unemployed, said that they flew out from New York to Los Angeles for a three-day holiday vacation because Quiroz-Santi had had a fight with his wife. They said that soon after arriving they met a stranger in a bar, and that for $150 and the stranger's promise of assistance in finding a rent-controlled apartment back in New York they spent much of the remainder of their vacation attempting to locate the trunk and mail

it back east. Taxis were rented at considerable expense to transport themselves and the trunk back and forth across town. The name of the mystery man whom they were supposedly assisting was changed from Coco to Benevadas during the trial in order to make it conform to evidence revealed by the prosecution at trial. When Ledesma arrived at Pena's apartment to claim the trunk, he made no mention of this stranger; rather, he said that he was planning to use the trunk to send clothes back to New York. In fact, he shipped the trunk to himself, and made no effort to locate Coco-Benevadas. When Ledesma and Quiroz-Santi elected to testify on their own behalf, they assumed the risk that the jury not only would disbelieve their story but also might wonder, quite properly, why their explanation of their conduct was so improbable.

█ We express no opinion as to whether the 69 grams of cocaine returned to the trunk by the Customs agents was a large enough quantity to make Ledesma and Quiroz-Santi entrepreneurs and, hence, to support their convictions for possession with intent to distribute. (The 69 grams, when diluted to a "street" quality, would yield approximately 1380 dosages, or nine months of intake for a typical user and was valued at approximately $6,700.) *See* United States v. Mather, 465 F.2d 1035, 1037–1038 (5th Cir.), cert. denied, 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 674 (1972), which held that possession of 197.75 grams of cocaine, valued at $2,500, was sufficient to justify the inference of intent to distribute. Since both defendants received identical, concurrent sentences on the conspiracy and possession counts, and since we have sustained the convictions on the conspiracy counts, we need not consider a claim of error connected only to the possession counts. *See* Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692 (1929); United States v. Ayala, 465 F.2d 464, 465 (9th Cir. 1972), cert. denied, 409 U.S. 1127, 93 S.Ct. 947, 35 L. Ed.2d 259 (1973); Johnson v. United

**44**

States, 427 F.2d 537, 539 (9th Cir. 1970).

We find no merit in the other assertions of error raised by Ledesma and Quiroz-Santi.

The judgments of conviction are affirmed.

HUFSTEDLER, Circuit Judge (concurring in part and dissenting in part):

Although I concur in the majority's affirmance of Ledesma's conviction, I cannot join in affirming Quiroz-Santi's conviction. In my view, there was not sufficient independent proof of Quiroz-Santi's knowledge of and participation in the conspiracy to permit introduction against Quiroz-Santi of hearsay testimony of statements made by alleged co-conspirators. Without the hearsay testimony, the evidence against Quiroz-Santi was not sufficient to sustain his conviction.

The Government produced only meager evidence of Quiroz-Santi's knowing participation in the conspiracy apart from the hearsay testimony concerning telephone conversations between Nancy Pena and Isabelle Soto and the transcriptions of several of those conversations: (1) Quiroz-Santi flew with Ledesma from New York, shared a motel room with him, and accompanied him while Ledesma picked up and shipped the trunk; (2) Quiroz-Santi used a different address when renting a car from that used in renting the motel room; (3) he waited outside Pena's apartment in a rented car while Ledesma picked up the trunk; and (4) he talked to Pena's neighbor when Ledesma had difficulty communicating with her. In addition, Quiroz-Santi's explanation for his conduct was somewhat strained.

All other "independent evidence" detailed in the majority opinion, including the hearsay testimony of Pena's neighbor that Ledesma told her that he had obtained her telephone number from Soto in Chile, concerns only Ledesma's involvement in the conspiracy. It is fundamental that evidence of Ledesma's guilt cannot be used to prove Quiroz-Santi's participation in the conspiracy merely because the two men associated with each other. (*E. g.*, Sibron v. New York (1968) 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917.) Other than establishing that he associated with Ledesma, the independent evidence of Quiroz-Santi's involvement revealed only that he engaged in some ambiguous conduct while traveling with Ledesma. That evidence is not sufficient to support a finding that Quiroz-Santi was a knowing participant in the conspiracy; conduct less innocuous repeatedly has been held insufficient to constitute prima facie evidence of involvement in a criminal enterprise. (*See, e. g.*, Sibron v. New York, *supra*, at 62–63; United States v. Di Re (1948) 332 U.S. 581, 592, 68 S.Ct. 222, 92 L.Ed. 210; United States v. Strickler (9th Cir. 1974) 490 F.2d 378, 380.)

Evidence that is not sufficient to justify admission of hearsay testimony of the Soto-Pena conversation is necessarily insufficient to sustain the jury's verdict that Quiroz-Santi was guilty of conspiring to possess and distribute cocaine.

I would reverse Quiroz-Santi's conviction.