**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Daniel E. MANNING and David A. Wooldridge, Defendants-Appellants.**

Nos. 74–1095, 74–1341, 74–1395.

United States Court of Appeals, Ninth Circuit.

Dec. 23, 1974.

Rehearing Denied, February 24, 1975.

James N. Barber (argued), Salt Lake City, Utah, for defendants-appellants.

Gregory C. Glynn, Asst. U. S. Atty., Los Angeles, Cal. (argued), for plaintiff-appellee.

Before LUMBARD,* ELY and WRIGHT, Circuit Judges.

## OPINION

EUGENE A. WRIGHT, Circuit Judge:

Appellants were convicted of conspiracy and multiple counts of violating the registration and antifraud provisions of the Securities Act and Exchange Act and mail fraud. They argue that their convictions should be reversed because of prejudicial jury misconduct, erroneous instructions to the jury, delay in production of exculpatory material, insufficient evidence, reliance on the advice of counsel, and delay in the bringing of indictments against them. We affirm.

Appellants were participants in a wide-ranging scheme to defraud the public by the sale of unregistered stock of several shell corporations with minimal assets. The unregistered stock was sold on the basis of false and misleading statements as to the actual assets and prospects of the corporations involved. Although eight persons were indicted for this conspiracy, only five stood trial. The remaining three, including Robert A. Eisenberg, the purported counsel of the appellants, were at the time of the trial fugitives in foreign countries. Of the five who were tried, only the appellants were convicted; charges against the other defendants at trial were either dismissed or resulted in verdicts of acquittal.

A major element of the scheme was the attempt to shield the sale of unregistered stock under then Rule 133 of the Securities and Exchange Commission, 17 C.F.R. § 230.133. Appellants distributed the stock of their two shell corporations, Empire Oil and Capitol Holding, through purported shareholders of corporations which supposedly were acquired in merger transactions. Had such mergers actually taken place and had the distributees in fact been shareholders of the merged companies, Rule 133 would have permitted limited sales of the stock received to the general public, despite the lack of a registration statement. Such sales could not have been made if the purpose of the entire transaction had been in fact the sale of such unregistered stock.

By padding the shareholder lists of Empire Oil and several corporations they purportedly acquired through merger, appellants sold unregistered Empire Oil and Capitol Holding stock to the public, using friends, innocent third parties and fictitious persons as "stockholders" and conduits.

* Senior Circuit Judge, United States Court of Appeals for the Second Circuit.

Sales of such stock were halted by the S.E.C. on January 15, 1969. The acts comprising elements of the charged conspiracy ended on December 31, 1969. A Criminal Reference Report of the S.E.C. was transmitted to the Department of Justice in October of 1971, the issue was referred to the U. S. Attorney in March of 1972, and the indictments were returned by the Grand Jury on February 14, 1973.

Appellants were sentenced to four years on the conspiracy count and to two years on each of several separate counts, the latter sentences to run concurrently with each other but consecutively to the conspiracy sentence. Appellant Wooldridge was fined $10,000 on the conspiracy count while Manning was fined $8,000 on the conspiracy count and $2,000 on an anti-fraud count.

■ Appellants claim that the trial judge erred in refusing to grant a new trial after several jurors reported alleged misconduct on the part of the forelady. The judge held an evidentiary hearing, questioned the jurors involved, and concluded that no prejudice to the defendants resulted from the conduct of the juror in question. We find no abuse of discretion on the part of the judge in refusing to grant a new trial. Holt v. United States, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910), United States v. Brumbaugh, 471 F.2d 1128 (6th Cir.), cert. den. 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144 (1973). No error was involved in relying on questions submitted by counsel rather than permitting them personally to cross-examine the jurors. United States v. Handy, 454 F.2d 885, 892 (9th Cir. 1971), cert. den. 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972).

■ The appellants argue that the trial court erred in refusing to accept their proposed instruction with respect to the vicarious liability of co-conspirators. The judge's instructions in this respect were proper. First, the proposed instruction [1] is not a correct statement of the holding in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), since it precludes any liability except for acts in which they "knowingly and willingly participated." *Kotteakos* held that it was error for the judge to instruct that conspiratorial liability could be premised on the overt act of any defendant when the underlying acts involved separate and independent conspiracies involving only a single central figure. This holding did not undercut the settled rule that a co-conspirator could be held liable for reasonably foreseeable acts committed in furtherance of the common illegal objective, Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

Second, given the strong evidence of a single, unified conspiracy, the instruction of the judge was proper. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 385, 92 L.Ed. 425 (1947); United States v. King, 472 F.2d 1 (9th Cir.), cert. den. 414 U.S. 864, 94 S.Ct. 40, 38 L.Ed.2d 84, reh. den., 414 U.S. 1033, 94 S.Ct. 463, 38 L.Ed.2d 325 (1973).

■ Appellants also argue that the evidence was insufficient to sustain their convictions. A careful review of the evidence indicates that there was substantial evidence to support the jury's verdict on the general conspiracy charge and on count 9 where the evidence of the appellants' fraudulent conduct is overwhelming.[2]

The appellants' contention that the government failed to prove willful violation of the registration and antifraud provisions of the Securities Act and Ex-

1. Defendants' requested instruction No. S14: "You may not attribute these acts of Robert Eisenberg to the Defendants in this case unless you have knowledge that they knowingly and willingly participated with him in accomplishing these acts."

2. Since the sentences for the substantive counts were identical and were to run concur-

rently, we need not examine the evidence adduced in support of the other counts, Jordan v. United States, 416 F.2d 338 (9th Cir. 1969), cert. den. 397 U.S. 920, 90 S.Ct. 930, 25 L.Ed.2d 101, reh. den. 397 U.S. 1018, 90 S.Ct. 1233, 25 L.Ed.2d 433 (1970); Benton v. Maryland, 395 U.S. 784, 791, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

change Act is without basis. *See* United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933), United States v. Custer Channel Wing Corporation, 376 F.2d 675 (4th Cir.), cert. den. 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119, reh. den. 389 U.S. 998, 88 S.Ct. 458, 19 L.Ed.2d 503 (1967).

■ The assertion that the appellants' actions were immunized by reliance on the legal advice of their alleged co-conspirator Eisenberg misreads the law in this respect. Bisno v. United States, 299 F.2d 711 (9th Cir. 1961), cert. den. 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962). Their actions in utilizing fictitious stockholders and nominees negative any claim that they thought they were acting lawfully. Moreover, it appears from the evidence that they did not treat Eisenberg as an independent, unbiased legal advisor, United States v. Piepgrass, 425 F.2d 194, 198 (9th Cir. 1970), United States v. Shewfelt, 455 F.2d 836, 839 (9th Cir.), cert. den. 406 U.S. 944, 92 S.Ct. 2042, 32 L.Ed.2d 331 (1972). Similarly, their claimed lack of knowledge about the provisions of the securities law provides no defense here, United States v. Wolfson, 405 F.2d 779 (2d Cir. 1968), cert. den. 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969).

■ The exclusion of testimony of Alex Chaplin was proper since it was not relevant to the issue before the court. Mr. Eisenberg's persuasiveness in other business dealings is not material to the question of the complicity of the appellants in the conspiracy actually before the court.

■ It is further asserted that the prosecution improperly delayed in providing appellant Manning an opinion letter by Eisenberg until shortly before trial, citing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The letter indicated that certain Empire Oil shares were exempt from registration. Similar letters were introduced as part of the prosecution's case. In light of the discussion, *supra,* of appellants' claim of good faith reliance on advice of counsel, this material cannot be construed as exculpatory. In any event, appellants have failed to show that they were in any way prejudiced by the delay in production of the letter.

■ Finally, the appellants argue that their right to a speedy trial and due process rights were violated by the three-and-a-half-year delay between the acts constituting their conspiracy and their indictment. The Supreme Court has held that a similar delay did not violate defendants' rights:

> [T]he Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an "accused," an event that occurred in this case only when appellees were indicted . . . .

United States v. Marion, 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971).

In stock selling schemes of complexity and magnitude, such as the scheme disclosed by the record of this case, considerable time is necessarily involved in assembling and verifying all the evidence which may be relevant to the government's decision to prosecute those thought to be culpable.

Appellants have failed to show that the length of time between the conspiratorial acts and indictment has prejudiced their defense, or has involved harassment, or was the intentional ploy of the prosecution to gain a tactical advantage, United States v. Erickson, 472 F.2d 505, 507 (9th Cir. 1973).

The judgment of the district court is

Affirmed.

ELY, Circuit Judge (concurring):

I concur in my Brother Wright's majority opinion. At the same time, however, I feel obliged to express my concern over the misconduct of one of the jurors, as well as that of the District Court's bailiff. The district judge properly and repeatedly admonished the jurors that none of them was to discuss the proceedings with any other person prior to the submission of the cause for their deliberation. Notwithstanding, the fore-

lady of the jury apparently defied the court's admonition.

At a post-trial hearing on the question of jury misconduct, the forelady admitted that she asked the court's bailiff early in the trial whether one could borrow money from a bank to buy stock. The bailiff answered to the effect that he thought not.[1] Furthermore, at some other time during the trial, the forelady had telephoned a bank office to make the same inquiry.

The forelady apparently believed that the answers to her questions were in some way related to the legal issues in the trial. At the jury misconduct hearing, two of the other jurors testified that during the course of the jury's deliberations, the forelady mentioned the bailiff's answer to her question.[2] When the district judge asked the forelady whether she had mentioned the bailiff's opinion during deliberations, she repled that she could not remember.

1. The bailiff's testimony concerning his conversation with the forelady was as follows:

"BY THE COURT:

Q. Mr. Torres, did you, during the pendency of this case, or its deliberations, have any conversation with Mrs. McDonald on any subject involving securities, or otherwise akin to the subjects being discussed in the case?

A. I had a conversation, your Honor, with her, but not in regard to this matter on trial.

\* \* \* \* \* \*

Q. Okay. Can you now relate to us what the foreman said, what you said, and what anybody else said in that conversation.

\* \* \* \* \* \*

A. She says, 'Frank, can I ask you a question?' She says, 'It has nothing to do with this case at all.'

I said, 'The answer is "No," but go ahead.'

She said, 'Can you go to a bank to borrow money to buy [stock]?'

And I said, 'I don't know.' I says, 'I can tell you what happened to me about ten years or more ago. I went to my credit union and told the man I wanted to borrow 100 percent money to buy 100 percent stock. He says, "You can't do it." '

I says, 'That is all I can tell you.' And that was the extent of that conversation at that time."

2. One juror testified as follows:

"BY THE COURT:

Q. Do you remember any statement by the jury forelady about a conversation with Frank Torres, our bailiff, on any matter of securities?

A. Yes. They were talking—I · didn't hear the whole conversation. I believe they were talking about loans, taking a loan from a bank to borrow securities being illegal.

\* \* \* \* \* \*

Q. Was any reference thereafter made to that conversation?

A. Yes. Later in deliberations she made a reference, 'Well, when I was talking to Frank about it, even he said—'

It was on some of the loans that were taken out by the defendants for the corporation, and at the time of the conversation \* \* \* [another juror] \* \* \* said, 'Well, you can't talk about the case', you know. And she says, 'Well, we are not. That has nothing to do with the case.'

So we dropped it. Then later in deliberations she mentioned it, and right away \* \* \* [another juror] \* \* \* said, 'Well, I thought you said that had nothing to do with this case.'

She says, 'Well, I was just referring to them borrowing money and then putting it into securities,' you know, which to her was illegal.

Which I said, 'I don't know. It was not mentioned in court. I don't know if it is or isn't.'

Q. In essence you said, 'Whatever wasn't mentioned in court we have to forget about it.'

A. Yes."

The other juror's testimony was similar:

"BY THE COURT:

Q. \* \* \* What, if anything, did the forelady tell you about the possible illegality of selling securities of a company that had no assets?

A. Well, that is where the borrowing money thing came in. She had told us that—we were discussing Mr. Manning's borrowing money to put into the company from banks, and she had a discussion before deliberation with Frank, the bailiff, about borrowing money to put into securities, was it illegal—

Q. With whom?

A. With Frank, the [bailiff] \* \* \* She was talking to him one day before we went into deliberations about it being illegal to borrow money to buy securities. And I told her, and \* \* \* [another] juror also told her, 'We don't think you ought to be discussing that.'

She said, 'It has nothing to do with this case.'

While the indiscretions of the forelady are deplorable and, in the light of the judge's admonitions, inexcusable, I have concluded from my reading of the entire transcript of the post-trial hearing that the forelady's actions did not likely affect the jury's ultimate determinations. Both of the jurors who testified about the forelady's conversation with the bailiff and her later mention of the conversation during jury deliberations insisted very positively that their decisions as to the guilt or innocence of the defendants on the offenses charged in the indictment were wholly unaffected by the forelady's comments. Consequently, I agree with my Brothers that the trial court's refusal to grant a new trial because of jury misconduct did not constitute an abuse of the court's discretion.

I am confident that the district judge has taken such necessary measures as to assure that the court's bailiff will not again commit such an indiscretion as he so thoughtlessly committed during the trial of this case.

But then during deliberations she brought that up, Frank had said such-and-such. And I told her, 'I thought you said that had nothing to do with the case when you were discussing it.' "