**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David SILVERMAN,
Defendant–Appellant.**

No. 83–1314.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 1984.

Resubmitted Feb. 24, 1988.

Decided Nov. 16, 1988.

**572**

Bruce M. Kaufman, Sherman Oaks, Cal., for defendant-appellant.

Brian L. Sullivan, Asst. U.S. Atty., Reno, Nev., for plaintiff-appellee.

Before WALLACE, ALARCON and NELSON, Circuit Judges.

ALARCON, Circuit Judge:

David Silverman appeals from his conviction for conspiracy to distribute a controlled substance (cocaine), possession with intent to distribute a controlled substance (cocaine), interstate travel in aid of racketeering, and aiding and abetting, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. §§ 1952(a)(3) and 2. He seeks reversal on two grounds.

First, he argues that the district court erred in admitting into evidence the extrajudicial statements of an alleged co-conspirator. He claims that apart from the contested statements themselves, insufficient evidence established his connection to the conspiracy.

Second, he contends that the district court erred in instructing the jury that a defendant's concealment of his identity from government agents would support an inference of guilt of the charged offenses. He asserts that because the concealment in this case occurred two months after the last act committed in the course of the alleged conspiracy and because the agents did not disclose the charges against him, no inference of guilt is justified.

In our initial decision on this appeal, we affirmed the judgment of conviction. *United States v. Silverman,* 771 F.2d 1193 (9th Cir.1985) (2-1). We subsequently granted the petition for rehearing and withdrew our initial decision. *United States v. Silverman,* 796 F.2d 339 (9th Cir.1986) (2-1). We sent our second opinion in this matter to the clerk's office for filing on June 22, 1987. We were compelled to withdraw that opinion the next day, however, because of the Supreme Court's decision in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). *Bourjaily* distinguished decisions we had relied upon in our second opinion on the issue of the admissibility of a co-conspirator's statements.

Having reexamined the record in light of *Bourjaily,* a majority of the court has concluded that the district court erred in admitting the statements of David Silverman's alleged co-conspirator. Because that error was prejudicial, we now reverse.

Reversal based on prejudicial error in the admission of evidence does not bar retrial. *United States v. Harmon,* 632 F.2d 812, 814 (9th Cir.1980) (per curiam). We, therefore, address David Silverman's contention that the district court erred in instructing the jury on flight, to assist the Government in determining whether retrial of this matter is warranted.

Before presenting the compelling reasons that support our conclusions, we set forth the facts pertinent to a clear understanding of the issues we must resolve in this case.

## I. PERTINENT FACTS

### A. *Motion in Limine*

Prior to trial, David Silverman, through his attorney Bruce M. Kaufman, filed a motion in limine requesting that the district court exclude certain hearsay statements allegedly uttered by his sister, Pearl Phoenix (Pearl), on the ground that the Government would be unable to demonstrate a preliminary fact upon which admission of the statements depended—David Silverman's connection to the alleged conspiracy. The district court denied the motion "without prejudice to object to the admission of such evidence at the time of trial or to move to strike same."

### B. *Testimony of Accomplice Willard*

The Government's principal witness was David Willard (Willard). Willard testified pursuant to a plea agreement in which he promised to assist the Government in exchange for its promise to dismiss certain charges against him.

Willard testified that he purchased cocaine from Pearl and resold it to Robert Zeitziff (Zeitziff). On three occasions, Zeitziff provided a private airplane in which he, Willard, and Pearl flew from Reno, Nevada to Van Nuys, California to obtain cocaine.

The first flight took place on May 13, 1983. After landing in Van Nuys, Willard called Valley Cab Co. to request a cab for Pearl. Willard testified as follows concerning Pearl's conduct and statements at the airport:

Q. And you called a cab for her?

A. I called a cab for her and she went outside to a pay phone and at which time—

Q. Why did she go to a pay phone?

A. She told me she was going to call somebody.

Q. Did she tell you who she was going to call?

A. Yes, she did.

Q. Who?

A. Her brother.

The record does not reveal whether Pearl completed this call or, if so, whom she called. The record does show that Pearl had two brothers, Frank Silverman and appellant David Silverman, both of whom resided in the western part of the San Fernando Valley.

Pearl departed in a cab. After having been away for two or three hours, she returned to the airport and gave Willard a package containing about six ounces of cocaine.

Zeitziff, Willard, and Pearl again flew to the Van Nuys Airport on May 31, 1983. Willard again called a cab for Pearl. The transcript contains the following testimony concerning this event:

Q. When you first got there what did you do, what did Bob Zeitziff do?

A. He went to take care of the plane.

Q. What did you do?

A. I went to call the cab.

Q. What did Pearl do?

A. She went to the pay phone.

Q. What did she do?

A. She called somebody.

Q. Who did she call?

A. Said her brother.

MR. KAUFMAN [Silverman's counsel]: Objection.

THE COURT: What is the basis of the objection, please?

MR. KAUFMAN: It's hearsay. Also calls for a conclusion of this witness.

MR. SULLIVAN [government counsel]: Your Honor, I submit it's not hearsay. He's basically explaining what the witness did.

THE COURT: All right, the objection will be overruled.

Again, the record does not show that this call was in fact completed or, if so, which brother was called. On this occasion, Pearl was away from the airport for an hour or two. Upon her return, she gave Willard another package containing approximately six ounces of cocaine.

Pearl, Willard, and Zeitziff flew to the Van Nuys Airport for a third time on June 25, 1983. Willard testified that upon landing they followed the "same procedure." Willard testified as follows:

Q. Where did you go?

A. I went to call a cab.

Q. Same cab company?

A. Same cab company and Mrs. Phoenix went to make a phone call.

Q. Did she tell you who she called?

A. Yes, sir.

Q. Who?

A. Her brother.

MR. KAUFMAN: Objection, Your Honor.

THE COURT: All right, is that on the same ground as previously?

MR. KAUFMAN: Yes, Your Honor.

THE COURT: Objection will be overruled on the same basis as previously.

This testimony does not establish whether the call was completed. It should also be noted that the court did not articulate the basis for its previous ruling. *See* quoted portion of the transcript concerning the May 31, 1983 extrajudicial statement set forth above. We must assume that the court overruled the objection because it accepted the prosecutor's theory that Willard was "basically explaining what the witness did."

Willard's testimony continued as follows:

Q. Did she tell you her brother's name?

A. Yes, sir.

Q. What was it?

A. David.

Q. Did she tell you his last name?

A. Silverman.

Q. Did she leave in the cab?

A. Excuse me, she didn't tell me she called David Silverman at that time. I knew the name was Silverman from before.

Willard further testified that on this occasion, after having been away from the airport for several hours, Pearl returned to the airport in a little blue car driven by a man. Willard made an in-court identification of Silverman, as "look[ing] like the individual" who was driving the car. On redirect examination, Willard stated that the driver "looked very much like him [David Silverman]." Willard testified that he had never met David Silverman, but had

seen a photograph of him at Pearl's house prior to June 23, 1983.

Willard was arrested shortly after his return to Nevada following the third trip to Southern California. He promised to cooperate with the Government. As part of the bargain, Willard agreed to record his conversations with Pearl and her husband, David Phoenix.

The Government introduced a tape recording of an August 1, 1983 conversation between Willard and Pearl. The district court overruled David Silverman's objection to the playing of this tape without explanation. During this conversation, Willard asked Pearl, "Is your brother cool?" Pearl responded, "Don't worry." The court indicated that this statement was admissible as "co-conspirators' statements."

Following the playing of these recordings, Government counsel asked Willard whether Pearl or David Phoenix had told him, prior to May 13, 1983, the name of her supplier of cocaine. Mr. Kaufman, Silverman's attorney, objected to this question. The court then heard argument on the objection outside the presence of the jury. Mr. Kaufman argued that the Government had not satisfied its "foundational requirements" for the admission of the extrajudicial statements of a co-conspirator. The court overruled the objection stating that it was "a fairly close, tough question for the court to tackle but nevertheless I think that it does meet the test of [Fed.R.Evid.] 801(d)(2)(E) and so I'm going to permit the question to be answered." The court did not discuss the evidence that it believed satisfied the government's burden of establishing the preliminary fact of Silverman's connection to the conspiracy.

Following the court's ruling, Willard testified as follows:

Pearl Phoenix. I'm not exactly clear on the dates when she told me, but it was in Floriston at their house, the Phoenixes' house and she explained to me that David Silverman had essentially acquired the cocaine business and that was where she was getting the coke from.

It should be noted that Willard testified that this unrecorded extrajudicial hearsay statement was made by Pearl sometime prior to May 13, 1983. Furthermore, there is no evidence in the record from any witness who saw the person who furnished cocaine to Pearl on May 13, 1983, May 31, 1983, or June 25, 1983.

## C. *Evidence of Cab Rides*

In an attempt to connect Silverman to the conspiracy, the Government offered evidence of cab rides taken by some person from the Van Nuys airport on May 13, 1983, May 31, 1983, and June 25, 1983. The general manager of the Valley Cab Co. testified that his business records showed that on May 13, 1983, a passenger was taken from the Van Nuys Airport to the intersection of Louise and Ventura, in Encino, California. The witness stated that this intersection is located in a commercial zone, approximately five miles from the airport. He further testified that his records disclosed that on May 31, 1983, a passenger was transported from the Van Nuys Airport to the intersection of Winnetka and Ventura, also a major commercial area. The witness stated that the distance between Louise and Winnetka on Ventura Boulevard is approximately six or seven miles. No evidence was introduced to prove that Pearl was the passenger in the cab on May 13 or May 31. The record is equally silent regarding whom, if anyone, the passenger contacted after exiting the cab at these two commercial locations.

The cab company's business records also showed that on June 25, 1983, a passenger was transported from Van Nuys Airport to 22601 Waterbury. Other evidence established that David Silverman resided at 22601 Waterbury, Woodland Hills, California. The cab driver made an in-court identification of Pearl as the passenger on this occasion. The Government stipulated, however, that on July 21, 1983, the Government had shown the driver a spread of twelve photographs, from which the driver identified another person as the passenger transported to 22601 Waterbury on June 25.

## D. *David Silverman's Concealment of His Identity*

The final piece of evidence relied upon by the Government to connect David Silverman to the conspiracy was his evasive conduct when three agents of the Drug Enforcement Administration (DEA) called at his home. One of the DEA agents testified that on August 23, 1983, at about 4:00 p.m., she and her fellow officers knocked on the door of the residence at 22601 Waterbury, Woodland Hills, California. David Silverman opened the door in response. The officers identified themselves as DEA agents and stated that they wanted to ask David Silverman some questions. Although the DEA agents knew that a warrant for the arrest of David Silverman had been issued, they did not then disclose this information to him. The man at the door replied that David Silverman was not home. The DEA agents left a phone number, requesting that David Silverman be informed that he should contact one of them when he returned.

Soon thereafter, the DEA agents were advised through a radio transmission that someone at 22601 Waterbury had contacted the DEA office. The DEA agents returned to the residence. David Silverman again appeared at the door. He falsely identified himself, claiming to be Jim Walker. The DEA agents then, for the first time, disclosed "that there was a warrant for Mr. Silverman's arrest." The DEA agents then stated that David Silverman should contact the DEA as soon as possible. The record contains no evidence that the DEA agents ever informed David Silverman of the charges contained in the warrant or the relationship of the alleged crimes to his sister or to violations of the narcotics laws.

As the DEA agents were driving away from the area, their supervisor contacted them by radio and stated that an attorney had advised him that David Silverman was willing to turn himself in at a later date. David Silverman surrendered voluntarily two days later. As a result of his voluntary surrender, the district court reduced the bail by two-thirds.

### E. David Silverman's Motion to Strike the Co–Conspirator's Statements

At the close of the Government's case-in-chief, David Silverman moved to strike the evidence of Pearl's out-of-court statements, "on the grounds that the Government has failed to lay the foundation required by the Court." David Silverman argued, *inter alia*, that the record contained no evidence independent of the statements themselves to connect him to the conspiracy.

The trial judge commented that he had "trouble" with "the proof of the conspiracy so far as David Silverman is concerned." The trial judge pressed the prosecutor to identify the evidence connecting David Silverman to the conspiracy. In response, the prosecutor summarized the evidence discussed above. The trial judge stated that he would consider this "serious question" overnight and announce his ruling in the morning.

The next day, the trial judge denied David Silverman's motion to strike the co-conspirator's statements. The trial judge did not discuss the evidence on which he based his ruling. The trial judge explained: "All that is necessary is that there be independent proof that David Silverman had a slight connection to the conspiracy or some cases say slight evidence of a connection to the conspiracy was offered. By either test there is that much evidence. That is there is a slight connection shown and that's about what it adds up."

## II. ANALYSIS

### A. Admission of Co-conspirator's Statements

■ Federal Rule of Evidence 801(d)(2)(E) provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). An accused's knowledge of and participation in an alleged conspiracy are preliminary facts that must be established before extrajudicial statements of a co-conspirator can be introduced into evidence. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2778,

97 L.Ed.2d 144 (1987); *United States v. Fleishman*, 684 F.2d 1329, 1337 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *United States v. Weaver*, 594 F.2d 1272, 1274 (9th Cir.1979); *United States v. Testa*, 548 F.2d 847, 852 (9th Cir.1977); *United States v. Ledesma*, 499 F.2d 36, 40 (9th Cir.), *cert. denied*, 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974). These preliminary facts must be shown by a preponderance of the evidence. *Bourjaily*, 107 S.Ct. at 2779.

Our standard of review is uncertain. Prior to the decision in *Bourjaily*, we reviewed *de novo* a district court's determination that the Government had sufficiently established the factual predicate for admission of a co-conspirator's statement. *See United States v. Smith*, 790 F.2d 789, 794 (9th Cir.1986) (whether Government has made requisite preliminary showing of conspiracy "is a question of law subject to *de novo* review"); *United States v. Rosales*, 584 F.2d 870, 872 (9th Cir.1978) (Wallace, J.) (whether Government has made requisite preliminary showing of conspiracy "is a question of law," hence "we are not confined to the 'clearly erroneous' or some other restricted standard of review").

The dissent cites *Bourjaily* for the proposition that "the district court's conclusion that preliminary facts have been established by a preponderance of the evidence is reviewed for clear error." Dissenting op. at 583; *see id.* at 585–586. The *Bourjaily* Court, however, did not address the issue of standard of review, nor did it unequivocally declare which standard is proper. *See United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir.1988) ("The appropriate standard of review ... was not an explicit holding in *Bourjaily*.").

Under the *de novo* standard of review, we do not defer to the lower court's ruling but freely consider the matter anew, as if no decision had been rendered below. *Exner v. FBI*, 612 F.2d 1202, 1209 (9th Cir. 1980). Under the more deferential "clearly erroneous" standard, we must accept the lower court's ruling unless, after reviewing the entire record, we are "left with the

definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), *quoted in Edinburgh Assur. Co. v. R.L. Burns Corp.*, 669 F.2d 1259, 1261 (9th Cir. 1982); *Dollar Rent A Car, Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1374 (9th Cir.1985).

We have carefully reviewed the record in this case. For the reasons discussed herein, we are left with the definite and firm conviction that the admission of the alleged co-conspirator's statements in this case was a serious mistake, one that prejudiced the defendant. Our conviction requires us to reverse the district court's ruling, whether that ruling is reviewed under the *de novo* or the "clearly erroneous" standard. For this reason, we need not, and do not, decide whether *Bourjaily* has effected a change in the standard of review heretofore applied in this circuit.

The Supreme Court ruled in *Bourjaily* that the plain meaning of Fed.R.Evid. 104(a) is that the district courts may consider the contested hearsay statements themselves, along with all other evidence, in determining whether the defendant had knowledge of and participated in the conspiracy. 107 S.Ct. at 2780. The Court explained: "To the extent that [the prohibition against bootstrapping set forth in *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)] meant that courts could not look to the hearsay statements themselves for any purpose, it has clearly been superseded by Rule 104(a)." *Id.* 107 S.Ct. at 2782.

In *Bourjaily*, the contested hearsay statements offered by the Government to prove the preliminary facts were amply corroborated by other evidence. The co-conspirator in *Bourjaily* told an FBI informant that the defendant was involved in a conspiracy with the co-conspirator, that the defendant had agreed to buy and distribute a kilogram of cocaine, that the defendant would be in his car at a certain hotel parking lot at a certain time, that the co-conspirator would obtain the cocaine from the informant in the parking lot, and that the

defendant would accept the cocaine from the co-conspirator. *Id.* at 2781. The co-conspirator's statements were corroborated by defendant's appearance at the designated time and place and by his acceptance of the cocaine. *Id.*

The Supreme Court held in *Bourjaily* that the trial court had not erred in considering the co-conspirator's statements to determine whether the Government had established, by a preponderance of the evidence, the preliminary facts of the defendant's knowledge of and participation in the alleged conspiracy. *Id.* at 2782. Because the contested statements were fully corroborated by evidence of defendant's own actions, the Court found it unnecessary to decide "whether the courts below could have relied *solely* upon [the co-conspirator's] hearsay statements to determine that a conspiracy had been established...." *Id.* at 2781–82 (emphasis added); *see id.* at 2791 (Blackmun, J., joined by Brennan and Marshall, JJ., dissenting) ("It is at least heartening ... to see that the Court reserves the question whether a co-conspirator's statement alone, without *any* independent evidence, could establish the existence of a conspiracy and a defendant's participation in it.").

This court has answered the question left open in *Bourjaily*. We have ruled that a co-conspirator's out-of-court statement, standing alone, is insufficient to establish that the defendant had knowledge of and participated in a particular conspiracy. *See Gordon*, 844 F.2d at 1402 (for co-conspirator statements to be admissible, "there must be some evidence, aside from the proffered statements, of the existence of the conspiracy and the defendant's involvement"). To abandon the requirement that *some* evidence aside from the proffered co-conspirator's statements be presented to show that the defendant knowingly participated in the alleged conspiracy would be to render all such statements self-validating. Such a ruling would "eliminate one of the few safeguards of reliability that this exemption from the hearsay definition possesses." *Bourjaily*, 107 S.Ct. at 2784 (Blackmun, J., joined by Brennan and Marshall, JJ., dissenting).

Accordingly, in this circuit, when the proponent of the co-conspirator's statement offers *no* additional proof of defendant's knowledge of and participation in the conspiracy, the statement must be excluded from evidence. Where, on the other hand, some additional proof is offered, the court must determine whether such proof, viewed in light of the co-conspirator's statement itself, demonstrates by a preponderance of the evidence that defendant knew of and participated in the conspiracy.

In determining whether the proponent has made a showing sufficient to permit the introduction into evidence of the co-conspirator's statement, the district court must bear in mind that out-of-court statements are presumptively unreliable. *See Bourjaily*, 107 S.Ct. at 2781. When the out-of-court statement is one made by a co-conspirator purporting to implicate others in an unlawful conspiracy, its reliability is doubly suspect. "[C]o-conspirator statements ... often have been considered to be somewhat unreliable. It has long been understood that such statements in some cases may constitute, at best, nothing more than the 'idle chatter' of a declarant or, at worst, malicious gossip." *Bourjaily*, 107 S.Ct. at 2790 (Blackmun, J., joined by Brennan and Marshall, JJ., dissenting); *accord Wong Sun v. United States*, 371 U.S. 471, 490 n. 17, 83 S.Ct. 407, 419 n. 17, 9 L.Ed.2d 441 (1963) (quoting Williams, *The Proof of Guilt* 135 (1958)) (" 'Even where ... the evidence of an accomplice becomes admissible against his fellows, it remains suspect evidence, because of the tainted source from which it comes.' "); Davenport, *The Confrontation Clause and the Co–Conspirator Exception in Criminal Prosecutions: A Functional Analysis*, 85 Harv.L. Rev. 1378, 1386–87 (1972) (statements made by a co-conspirator prior to termination of the conspiracy "may ... suffer from the same kinds of exclusively self-serving motives and possibly faulty memories that allegedly infect many post-termination statements"); Levie, *Hearsay and Conspiracy: A Reexamination of the Co–Conspirators' Exception to the Hearsay Rule*, 52 Mich.L.Rev. 1159, 1165–66 (1954) ("The conspirator's interest is likely to lie in misleading the listener into believing the conspiracy stronger with more members (and different members) and other aims than in fact it has.").

Although, as *Bourjaily* instructs, Fed.R. Evid. 104(a) permits a trial judge to consider the co-conspirator's out-of-court statement in assessing the statement's admissibility, Rule 104(a) does not diminish the inherent unreliability of such a statement. Because of this presumptive unreliability, a co-conspirator's statement implicating the defendant in the alleged conspiracy must be corroborated by fairly incriminating evidence. Evidence of wholly innocuous conduct or statements by the defendant will rarely be sufficiently corroborative of the co-conspirator's statement to constitute proof, by a preponderance of the evidence, that the defendant knew of and participated in the conspiracy. Evidence of innocent conduct does little, if anything, to enhance the reliability of the co-conspirator's statement. A co-conspirator's statement, which is presumptively unreliable hence inadmissible standing alone, is no more reliable when coupled with evidence of conduct that is completely consistent with defendant's unawareness of the conspiracy.

*Bourjaily* itself provides one example of the sort of incriminating evidence that sufficiently corroborates a co-conspirator's statement to establish, by a preponderance of the evidence, defendant's connection to the conspiracy. In *Bourjaily*, the evidence showed that the defendant had committed a criminal act that furthered the conspiracy described in the co-conspirator's statement. *See* 107 S.Ct. at 2781. Our own cases provide similar examples. *See, e.g., United States v. Crespo de Llano*, 830 F.2d 1532, 1543 (9th Cir.1987) (defendant was present during negotiations for sale of cocaine, obtained sample for government undercover agent to taste, translated price of cocaine from Spanish to English, and appeared at prearranged location for the cocaine transaction); *United States v. Paris*, 827 F.2d 395, 400 (9th Cir.1987) (defendant met with intermediary just before latter provided government undercover agent with cocaine sample, and defendant arrived with one kilo-

gram of cocaine at prearranged time and location for transaction).

Of course, evidence short of proof of the commission of a substantive offense may also be sufficient to show, by a preponderance of the evidence, the defendant's knowing participation in the alleged conspiracy. *See, e.g., United States v. Stewart,* 770 F.2d 825, 831 (9th Cir.1985) (defendant was present at seller's house immediately before each of three drug transactions, seller and defendant met immediately after two of the transactions, and defendant's palm print was found on envelope that contained the drug), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 888, 88 L.Ed.2d 922 (1986); *United States v. Mason,* 658 F.2d 1263, 1269 (9th Cir.1981) (defendant was the only person to visit seller between time seller telephoned his source to obtain contraband and time seller provided contraband to government undercover agents).

■ In the present case, by contrast, the evidence aside from the proffered co-conspirator's statements is completely consistent with a conclusion that David Silverman was unaware of the conspiracy. The evidence is insufficiently corroborative of Pearl's out-of-court statements to overcome the presumption of unreliability that makes those statements inadmissible standing alone.

According to Willard, Pearl told him that David Silverman was her cocaine source. In addition, on each trip to the Van Nuys airport, Pearl allegedly told Willard that she was going to call, or had called, an unspecified brother. Pearl also responded "Don't worry" when Willard inquired whether her brother was "cool" concerning payment for cocaine.

■ Pearl's statements are mutually corroborative only if one assumes, as the dissent apparently does, that each is independently reliable. *See* dissenting op. at 584. We submit that such assumption is erroneous. As explained above, a co-conspira-

tor's out-of-court statements are presumptively unreliable. One presumptively unreliable statement cannot be invoked to corroborate another, particularly when each was allegedly uttered by the same declarant.[1]

The admissibility of the contested statements, therefore, hinges on whether the additional evidence proffered by the Government to demonstrate David Silverman's connection to the conspiracy sufficiently corroborates the statements to overcome their presumed unreliability. We conclude that the additional evidence fails to provide sufficient corroboration.

Evidence that David Silverman drove his sister to the airport on one occasion makes only slightly more probable his connection to the conspiracy than do the hearsay statements alone. Such evidence shows little more than that he was in the presence of a relative who was involved in a conspiracy. That Pearl attempted to visit Silverman during one of her cocaine-buying expeditions is, likewise, only marginally probative of his involvement in the conspiracy, hence marginally corroborative of the contested statements. We have consistently recognized that evidence that a defendant merely associated with a member of a conspiracy has little probative value in demonstrating the defendant's connection to that conspiracy. *See, e.g., United States v. Weaver,* 594 F.2d 1272, 1275 (9th Cir.1979) (evidence that defendant was passenger in truck and that wrapped package of cocaine was found partly under passenger's seat did not constitute even "slight" evidence connecting defendant to alleged conspiracy); *United States v. Griffin,* 434 F.2d 978, 984 (9th Cir.1970) (quoting with approval *United States v. Ragland,* 375 F.2d 471, 476–77 (2d Cir.1967), *cert. denied,* 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968)) ("[A]n association with an alleged conspirator, without more, is insufficient to establish the necessary foundation for the admissibility of the incriminating [co-con-

---

1. Pearl's statements at the airport that she was going to call "her brother" were admissible to prove Pearl's intent. *See* Fed.R.Evid. 803(3). The fact that such statements were admissible,

however, does not make them any more reliable or any more corroborative of Pearl's statement identifying a particular brother—David—as her cocaine source.

spirator's] statements."), *cert. denied,* 402 U.S. 995, 91 S.Ct. 2170, 29 L.Ed.2d 160 (1971).

Although evidence of Pearl's association with her brother David, viewed in light of Willard's statement that Pearl told him that David was her source, makes the hearsay more reliable to some small degree, the evidence is simply too innocent to demonstrate David's connection to the conspiracy by a preponderance of the evidence, *i.e.,* to make the connection more likely than not. It is significant that the Government presented no evidence that David Silverman was aware that Pearl delivered cocaine to Willard after Silverman dropped her off at the airport on June 25, 1983.

Likewise, evidence that David Silverman temporarily concealed his identity from the DEA does not sufficiently corroborate Pearl's statements to prove, by a preponderance of the evidence, that he knew of or participated in the conspiracy with which he was charged. His concealment occurred two months after Pearl's last trip to Van Nuys. As we explain in Part II(B) below, this two-month delay, coupled with the absence of any showing by the Government that David Silverman was aware that he was suspected of involvement in any cocaine-related crime, renders any inference of guilt from such concealment improper.

In summary, we recognize that the Government proffered *some* additional evidence to corroborate Pearl's contested extrajudicial statements. The district court characterized the additional evidence as "slight" but nevertheless found it sufficient to support admission of Pearl's statements under Rule 801(d)(2)(E). We agree that the additional evidence is "slight," if that, but disagree that the evidence supports admission of Pearl's statements. We believe that the additional evidence proffered by the Government was so marginally corroborative that it failed to overcome the presumptive unreliability of Pearl's statements. Thus, even when the additional evidence is assessed in light of those

statements, a preponderance of the evidence fails to demonstrate that David Silverman knew of and participated in the alleged conspiracy. Accordingly, the district court erred in admitting Pearl's extrajudicial statements identifying David Silverman as her cocaine source.

■ An error in the admission of evidence requires reversal only if the error affected a party's substantial rights. *See* 28 U.S.C. § 2111 (1982) (appellate court shall give judgment without regard to errors that do not affect substantial rights of parties); *United States v. Murray,* 751 F.2d 1528, 1533 (9th Cir.) ("An erroneous evidentiary ruling will be reversed if a defendant shows that a substantial right has been affected."), *cert. denied,* 474 U.S. 979, 106 S.Ct. 381, 88 L.Ed.2d 335 (1985). In the present case, Pearl's contested statements were undoubtedly the bases for the jury's conclusion that David Silverman was guilty of conspiracy. The district court's error in admitting the statements, therefore, was necessarily prejudicial and compels reversal. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2885, at 289–90 (1973) ("[I]f the evidence is insufficient to support the verdict without the erroneously admitted evidence, the error must be held prejudicial.") (footnote omitted).

### B. *The Modified Flight Instruction*

■ Reversal on the ground of erroneous admission of the co-conspirator's statements does not preclude retrial of David Silverman on Double Jeopardy grounds. *See United States v. Harmon,* 632 F.2d 812, 814 (9th Cir.1980) (per curiam) (Double Jeopardy Clause does not bar retrial after reversal for trial error). For the guidance of the Government, and the district court in the event of retrial, we next address the contention that the district court erred in instructing the jury that it might infer guilt from David Silverman's concealment of his identity from the DEA agents who called at his home.[2]

---

**2.** The trial court instructed the jury as follows: The intentional concealment of a defendant after the commission of a crime, or after he is

accused of a crime that has been committed, is not of course sufficient in itself to establish his guilt; but it is a fact which, if proved, may

Flight instructions are valid only if there is evidence sufficient to support a chain of unbroken inferences from the defendant's behavior to the defendant's guilt of the crime charged. *United States v. Feldman*, 788 F.2d 544, 555 (9th Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). The Fifth Circuit has described this requirement clearly, explaining that four inferences must be justified: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). We have cited the *Myers* analysis with approval. *See, e.g., Feldman*, 788 F.2d at 555; *United States v. Guerrero*, 756 F.2d 1342, 1347 (9th Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984).

The inference from proof of an unfocused consciousness of guilt to consciousness of guilt concerning the crime charged has proven especially problematic. Flight and concealment of identity can be consistent with innocence, or with guilt of misconduct unknown to the Government.[3] Accordingly, we must evaluate flight instructions by looking for facts that support the inference from flight to a consciousness of guilt of the specific crime charged. For example, we consider whether the defendant knew the police suspected him of a particular crime. *See United States v. Tille*, 729 F.2d 615, 622 (9th Cir.) (upholding flight instruction where local newspa-

per had reported progress of police investigation and defendant had been carrying name and address of criminal defense attorney when arrested), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 & 848, 105 S.Ct. 164, 83 L.Ed.2d 100 (1984); *United States v. Hernandez–Miranda*, 601 F.2d 1104, 1107 (9th Cir.1979) (upholding flight instruction where defendant had been arraigned and had pled guilty prior to fleeing and, therefore, knew about the charges against him). We also consider whether the defendant fled immediately after the crime. *See Feldman*, 788 F.2d at 555 (finding flight instruction improper where defendant's behavior was not immediate); *Hernandez–Miranda*, 601 F.2d at 1106 (stating that flight instructions should not be given unless flight was immediate or defendant knew about the charges against him); *see also Myers*, 550 F.2d at 1051 ("The immediacy requirement is important.... The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.").

Under the totality of the circumstances in the present case, we find that it was error to give an instruction on flight. David Silverman's concealment of his identity lacked sufficient connection to the criminal acts for which he was charged. Although we agree with the Government that it is reasonable to infer from the fact that David Silverman concealed his identity that he was conscious that he was suspected of some wrongdoing, the Government has offered no evidence from which it can be inferred that he was conscious of guilt

be considered by the jury in light of all other evidence in the case, in determining guilt or innocence. Whether or not evidence of concealment shows a *consciousness of guilt*, and the significance to be attached to any such evidence, are matters exclusively within the province of the jury.

In your consideration of the evidence of concealment you should consider that there are many reasons for this which are fully consistent with innocence. These may include fear of being apprehended, unwillingness to confront the police, or reluctance to appear as a witness. Let me suggest also that

a feeling of guilt does not necessarily reflect actual guilt.

The jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

3. Although many of our cases have involved flight rather than concealment, the principles discussed below apply equally to both. *See Feldman*, 788 F.2d at 555 (defendant altered appearance by shaving beard shortly before trial).

of any cocaine-related offense. There is no evidence in the record that David Silverman was aware of his sister's criminal conduct or that the DEA agents informed him during their visits that he was suspected of having committed any cocaine-related crime. For all the evidence shows, he might have been concealing his identity because he was conscious of having committed a drug-related offense unknown to the Government. Moreover, uncontradicted evidence suggests that David Silverman concealed his identity in order to make arrangements through his attorney to surrender voluntarily rather than face possible arrest at his residence. As noted above, his cooperation with the Government in surrendering voluntarily resulted in a two-thirds reduction in bail.

■ Further, David Silverman's concealment of his identity occurred two months after Pearl's last trip to Van Nuys and the last criminal act committed in furtherance of the alleged conspiracy.[4] This two-month delay, coupled with the absence of any showing by the Government that David Silverman was aware of the nature of the charges against him at the time he concealed his identity, renders any inference of guilt from such concealment improper. *See Feldman*, 788 F.2d at 555;

4. Evidence that a defendant fled immediately after a crime was committed supports an inference that the flight was motivated by a consciousness of guilt of *that* crime. As the time between the commission of the offense and the flight grows longer, the inference grows weaker. *See Myers*, 550 F.2d at 1051.

Under the circumstances of this case, the two-month delay between the last act in furtherance of the alleged conspiracy and David Silverman's concealment of his identity undermines the inference that Silverman's flight was motivated by a consciousness of involvement in an unlawful conspiracy with Pearl. The fact that he concealed his identity immediately upon being confronted by the DEA agents is irrelevant. The agents did not, at that time, inform Silverman that he was suspected of having committed any crime. Moreover, because the agents did not confront him until long after the last alleged act in furtherance of the conspiracy, Silverman's flight cannot reasonably be said to be related to the charged offenses, to the exclusion of other, unknown offenses. The evidence of Silverman's flight, therefore, does not support an inference of guilt of the offenses with which he was charged.

*Hernandez–Miranda*, 601 F.2d at 1106; *United States v. White*, 488 F.2d 660, 662 (8th Cir.1973) (flight instruction improper where "defendant was not advised of the crime ... charged ... at the time of his flight, the attempted arrest occurred over five months after the transaction charged, and there [was] no indication that defendant knew at the time of his flight that he was being sought for the crime charged"). Because the other nonhearsay evidence introduced against him was insufficient to connect him to a conspiracy, the instruction on flight was necessarily prejudicial.

## III. CONCLUSION

We have concluded that the district court erred in admitting Pearl's out-of-court statements implicating David Silverman in the alleged conspiracy under Fed.R.Evid. 801(d)(2)(E). The Government failed to present corroborative evidence sufficient to establish, by a preponderance of the evidence, the preliminary facts of Silverman's knowledge of and participation in the conspiracy. Since the improperly admitted hearsay was the principal evidence that David Silverman was guilty of conspiracy, the court's error in admitting the statements was prejudicial.

REVERSED.

We recognize that Silverman was charged not with discrete acts of supplying cocaine but with, *inter alia*, participating in an ongoing conspiracy. *See* dissenting op. at 589–590. The dissent would find that Silverman's flight was "immediate" because the flight "occur[red] during or within an appropriate time after the conspiracy and ... [was] directed toward law enforcement agents investigating the crime." *Id.* at 589–590. Under the dissent's approach, Silverman's flight would have been "immediate" whether it occurred two days, two months, or even two years after commission of the last *act* in furtherance of the alleged conspiracy, because the conspiracy itself was ongoing as a matter of law. In our view, such an approach is inconsistent both with the logic behind the immediacy requirement and with our precedents, which measure the immediacy of a defendant's flight by reference to some discrete event. *See, e.g., Feldman*, 788 F.2d at 555 (defendant's flight reaction must be "immediate to the crime"); *United States v. Sims*, 617 F.2d 1371, 1378 (9th Cir.1980) ("[f]light immediately after the commission of a crime"); *Hernandez–Miranda*, 601 F.2d at 1106 (defendant's flight must be "immediately after the commission of a crime").

WALLACE, Circuit Judge, dissenting:

The majority reverses Silverman's conviction on the ground that the district court improperly admitted two statements of a co-conspirator under the hearsay exception of Rule 801(d)(2)(E) of the Federal Rules of Evidence. The majority's analysis of the foundation for admitting these two statements develops a rule of law inconsistent with the Supreme Court's decision in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987) (*Bourjaily*), and with our duty to affirm the factual findings of the district court if they are not clearly erroneous. I therefore dissent. In addition, I must disagree with the majority's holding that it was improper for either the court or the jury to consider evidence that Silverman attempted to conceal his identity from DEA agents investigating the crime with which Silverman was charged. Considered in light of other evidence introduced to prove Silverman's involvement in the drug conspiracy, Silverman's conduct could properly support an inference that he was conscious of his guilt of the criminal activity that ultimately led to his conviction. I would, therefore, affirm Silverman's conviction.

I

Prior to the Supreme Court's recent decision in *Bourjaily*, co-conspirator statements were admissible in this circuit only if the court found "independent evidence of the existence of the conspiracy and of the defendant's connection to it," and concluded that "the statement was made both during and in furtherance of the conspiracy." *United States v. Layton*, 720 F.2d 548, 555 (9th Cir.1983), *cert. denied*, 465 U.S. 1069, 104 S.Ct. 1423, 79 L.Ed.2d 748 (1984). We required the government to provide "substantial evidence," independent of the contested hearsay statements, demonstrating that the defendant had "at least a slight connection" to an existing conspiracy. *United States v. Rabb*, 752 F.2d 1320, 1325 (9th Cir.1984), *cert. denied*, 471 U.S. 1019, 105 S.Ct. 2027, 85 L.Ed.2d 308 (1985). We applied a de novo standard of review to the independent proof of a conspiracy and a clearly erroneous standard to the district court's finding that co-conspirator statements were made during and in furtherance of the conspiracy. *United States v. Smith*, 790 F.2d 789, 794 (9th Cir.1986).

In *Bourjaily*, the Supreme Court expressly rejected the rule requiring that existence of and membership in a conspiracy be established by evidence independent of the contested hearsay statements. *Bourjaily*, 107 S.Ct. at 2782. Although the Court left open the question whether the challenged statements could constitute the sole basis for their own admissibility, it held that "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." *Id.*

The Court's holding in *Bourjaily* explicitly abolished the prohibition against using hearsay to "lift itself by its own bootstraps to the level of competent evidence." *Glasser v. United States*, 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), which was followed by eleven circuits, including our own, prior to *Bourjaily*. *See* 1 J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 104[05] n. 33 (1986) (collecting cases adopting the independent evidence requirement). In doing so, the Court held that the preliminary question whether a proper foundation has been provided is a "factual" one, and that the district court's conclusion that preliminary facts have been established by a preponderance of the evidence is reviewed for clear error. *Bourjaily*, 107 S.Ct. at 2778 ("the existence of a conspiracy and petitioner's involvement in it are preliminary questions of fact"); *id.* at 2782 (holding that the district court's factual finding that the government had established the defendant's involvement in the conspiracy by a preponderance of the evidence was not clearly erroneous). The Court stressed that under Rule 104 of the Federal Rules of Evidence, the trial judge, in making the preliminary factual determination, may consider "any evidence whatsoever," with the exception of privileged information, *id.* at 2780, and that the judge is entitled to "receive the evidence and give it such weight as his judgment and experience counsel." *Id.* at 2782, *quoting Unit-*

ed States v. Matlock, 415 U.S. 164, 175, 94 S.Ct. 988, 995, 39 L.Ed.2d 242 (1974).

## A.

With these governing principles in mind, it is clear that there was adequate evidence before the trial judge to support his determination that the government had satisfied its burden of establishing Silverman's connection to the conspiracy. The question before the trial court was a narrow one. The government presented overwhelming evidence that co-conspirators Pearl and Willard flew to the San Fernando Valley on three occasions for the purpose of obtaining cocaine. On each occasion, Pearl left the airport in a cab and returned one to three hours later with several ounces of cocaine. Thus, the question before the court was not whether Pearl and Willard obtained cocaine from a source in the Van Nuys area, but from whom Pearl obtained the cocaine on each occasion.

The government presented several pieces of evidence which, in combination, tended to show that Pearl obtained the cocaine from Silverman on each occasion. First, Willard, an admitted member of the conspiracy, testified that Pearl had explicitly identified her brother, David Silverman, as her cocaine source. On another occasion, when asked by Willard if her brother was "cool," Pearl responded, "Don't worry." Under Bourjaily, this evidence itself could be considered in conjunction with the other evidence offered to show that Silverman was the source from whom the conspirators obtained their cocaine. Id. 107 S.Ct. at 2781 (rejecting the proposition that since hearsay statements of accomplices are unreliable, "they should not form any part of the basis for establishing a conspiracy").

Next, the government offered evidence that on each occasion, after arriving at the Van Nuys airport, Pearl told Willard that she was going to call her brother. These statements, although made out of court, were admissible as statements of a party's then-existing intent. Fed.R.Evid. 803(3). Viewing this evidence in conjunction with the hearsay statement identifying David Silverman as Pearl's cocaine source and

with the undisputed evidence that the purpose of each of her visits to the Van Nuys area was to obtain cocaine, the district court could properly infer that the "brother" Pearl referred to on each occasion was David Silverman, and that the purpose of each phone call was to arrange a meeting with her source. It is, of course, possible to speculate that Pearl may have been placing a purely social call to her brother, or that she actually intended to call a different brother. However, it is not our function to determine which inferences to draw from the evidence of Pearl's statements on appeal. As the Court stated in Bourjaily, in making an admissibility determination, "the judge should receive the evidence and give it such weight as his judgment and experience counsel." 107 S.Ct. at 2782. We do not sit to reweigh the evidence before the trial court, but only to determine whether the trial court's conclusions were clearly erroneous. Id.

The evidence that Pearl intended to call Silverman, standing alone, is arguably insufficient to corroborate her statement that Silverman was her source. There is no evidence that Pearl actually contacted Silverman during any of these calls. However, the government produced additional evidence tending to show that Pearl in fact contacted Silverman and obtained the cocaine from him.

First, taxicab records and the testimony of the cab driver were strong evidence that Pearl took a cab to David Silverman's residence on at least one of the three occasions. Viewed in the light of the evidence previously mentioned, the judge could properly find that Pearl in fact went to Silverman's house that evening for the purpose of obtaining cocaine. Moreover, evidence that Pearl returned to the airport approximately two hours later with six ounces of cocaine suggests that she was successful in this venture. Finally, Willard testified that on that very evening, Pearl returned to the airport in a car driven by a man who resembled David Silverman, gave the cocaine to Willard, and then drove off with the man resembling Silverman. Even without considering Pearl's statement identifying Sil-

verman as her supplier, in light of the evidence showing that Pearl was taken directly to Silverman's residence that evening and returned to the airport approximately two hours later with the cocaine, the district court was surely entitled to conclude from the testimony identifying Silverman as the man who drove Pearl back to the airport that Silverman was, in fact, Pearl's supplier.

After carefully considering this evidence, the district court found a sufficient showing of Silverman's link to the conspiracy independent of Pearl's challenged statements. Maj. op. at 575–76. With *Bourjaily's* direction that the court should also consider those statements, including Pearl's specific identification of Silverman as her cocaine source, the probative value of the circumstantial evidence of Silverman's involvement in the conspiracy is dramatically heightened. *Bourjaily* instructs us that "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." 107 S.Ct. at 2781. Once it is permissible to consider Willard's testimony that Pearl identified Silverman as the source for their cocaine, the inferences that can be drawn from the circumstantial evidence clearly provide the required preponderance of proof of Silverman's connection to the conspiracy.

## B.

This seems so clear. How did the majority come to the opposite conclusion? The majority commits two fundamental errors when analyzing the evidence offered by the government, both of which conflict with the Supreme Court's decision in *Bourjaily*. First, disregarding both *Bourjaily's* disapproval of the no-bootstrapping rule and its holding that the district court may, under Fed.R.Evid. 104, consider "any [unprivileged] information whatsoever" when making its preliminary factual determinations, the majority announces that the district court may not admit a co-conspirator statement unless it is corroborated by independently incriminating evidence. *See* maj. op.

at 578. Second, in spite of the Supreme Court's clear admonitions in *Bourjaily*, the majority fragments and minimizes the importance of the evidence which formed the basis of the trial court's conclusion. *See id.* at 579–80. I believe this approach to the evidence to be inconsistent with the *Bourjaily* opinion, which states repeatedly that the district court is entitled to view the foundational evidence, including contested hearsay statements, as a whole, rather than as isolated fragments. *Bourjaily*, 107 S.Ct. at 2779–81. Thus, "[e]ven if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case." *Id.*

The majority's holding that the government failed to offer sufficient evidence corroborating the challenged out-of-court identifications of Silverman as Pearl's supplier cannot be reconciled with *Bourjaily*. First, the majority states that Pearl's statements that she intended to call her brother, like her challenged hearsay statements identifying her brother as her source, are presumptively unreliable and thus cannot corroborate the challenged hearsay statement identifying her brother as her supplier. Maj. op. at 579. This holding clearly conflicts with the Court's holding in *Bourjaily* that the district court may, under Fed.R.Evid. 104, consider "any evidence whatsoever," with the exception of privileged information, when making its preliminary factual determinations. *Bourjaily*, 107 S.Ct. at 2780. Under *Bourjaily*, the district judge was entitled to receive this evidence and give it such weight as his experience and judgment counseled. *Id.* at 2782. The majority's analysis ignores this holding, and establishes a rule that, in effect, requires that the district court ignore any "unreliable" evidence, including *admissible* out-of-court statements of a co-defendant, when determining the defendant's connection to the conspiracy. This is precisely the rule that a majority of the Supreme Court overruled in *Bourjaily*.

I do not differ with the majority regarding the government's obligation to produce

*some* evidence *corroborating* the challenged hearsay statements. Although the Supreme Court left this question open in *Bourjaily,* our subsequent decision in *United States v. Gordon,* 844 F.2d 1397, 1402 & n. 2 (9th Cir.1988), reaffirms that, in this circuit, there must be some evidence, in addition to the challenged statements, of the existence of the conspiracy and the defendant's involvement in it. However, by insisting that the additional evidence offered by the government be incriminating enough to overcome the "presumptive unreliability" of the hearsay, the majority transforms a rule requiring *additional* evidence *corroborating* the hearsay statements into a rule requiring that the government prove, by proof *independent* of the hearsay, that the defendant knew of and participated in the conspiracy. To require that the district court view corroborating evidence independently from any out-of-court statement of a co-conspirator on the grounds that such statements are "inherently unreliable" simply reestablishes the pre-*Bourjaily* no-bootstrapping rule in this circuit. A majority of the Supreme Court, over a strongly worded dissent, explicitly rejected the proposition that co-conspirator statements are so inherently unreliable "that they should not form any part of the basis for establishing a conspiracy," 107 S.Ct. at 2781, and observed that such statements "could themselves be probative of ... the participation of ... the defendant ... in the conspiracy." *Id.* As a court of appeals, we are not free to adopt the views of the dissenters and reject those of the majority of the Supreme Court.

Second, in light of *Bourjaily's* observation that "a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence," *id.* at 2781, the district court was clearly entitled to view the evidence of Pearl's attempts to call her brother, her identification of her brother as her source, her visit to her

brother's house, her brother's presence in the car with Pearl during one of her cocaine-buying expeditions, and her brother's subsequent attempt to conceal his identity from the DEA as a whole, rather than as independent pieces of evidence. The majority's analysis, in contrast, minimizes the probative force of this evidence by breaking it into isolated fragments. The majority examines each piece of evidence offered to show Silverman's link to the conspiracy separately, inquiring of each piece whether it is consistent with Silverman's innocence or indicative of his guilt. *See* maj. op. at 579–80. This mode of analysis cannot survive the plain language of the *Bourjaily* decision.

In sum, by requiring that the proponent of a challenged co-conspirator hearsay statement overcome the "presumptive unreliability" of the statement with "fairly incriminating" evidence which "demonstrates by a preponderance of the evidence that defendant knew of and participated in the conspiracy," *see id.* at 578, the majority has attempted to transform the concerns of the dissenters in *Bourjaily* into the law of this circuit. (*See* maj. op. at 577–78, citing *Bourjaily* dissents.) I must, therefore, respectfully dissent.

C.

The majority's analysis of the district court's admissibility determination in this case also ignores our very limited role in reviewing the factual findings of the district court. We do not review the finding of a sufficient connection to the conspiracy de novo, but may reverse only if we determine that the district court's finding is clearly erroneous. *See Bourjaily,* 107 S.Ct. at 2782; *see also id.* at 2778 ("the existence of a conspiracy and petitioner's involvement in it are preliminary questions of fact that, under Rule 104, must be resolved by the court").[1]

1. Responding to my dissent, the majority suggests that *Bourjaily's* statement that the trial court's "factfinding" in that case "was [not] clearly erroneous" may not be binding on this court because the Supreme Court did not "unequivocally declare which standard is proper."

*See* maj. op. at 576. The statement in *Bourjaily* clearly was not dictum, nor does it appear to be merely a careless mistake. The Court repeatedly stressed that the question whether the defendant was a member of a conspiracy *is a question of fact, see* 107 S.Ct. at 2778–79; that the district

Under the clearly erroneous standard, a reviewing court may not reverse a district court's view of the evidence as long as it "is plausible in light of the record viewed in its entirety ... even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (*Anderson*) (construing Fed.R.Civ.P. 52(a)); *see also United States v. McConney,* 728 F.2d 1195, 1200 n. 5 (9th Cir.) (en banc) (explaining that the clearly erroneous test set forth in Rule 52(a) is applicable to both civil and criminal proceedings), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. Moreover, the rule that deference must be paid to the original finder of fact applies even where the district court's findings do not rest on a credibility determination, but are based instead on inferences from other facts. *Id.*

In the present case, the district court's finding that substantial evidence established Silverman's connection to the conspiracy rested on the inferences drawn from the circumstantial evidence presented by the government. Under *Anderson,* findings of the district court that rest on inferences drawn from the facts are entitled to the same deference accorded a trial court's credibility determinations. *Id.* The majority's analysis of the evidence presented to support the admission of the hearsay statements utterly disregards the deference due to the district court. The majority reexamines each piece of evidence offered to corroborate the hearsay statement and, in each case, draws inferences from the evidence necessarily rejected by the

court acts as a "factfinder" when making this determination, *id.* at 2781; and that the judge, when evaluating foundational evidence under Rule 801(d)(2)(E), is entitled to "receive the evidence and give it such weight as his judgment and experience counsel," *id.* at 2782. The Court certainly *applied* the clearly erroneous standard to the district court's factfinding in

district court. This approach cannot be reconciled with *Bourjaily.*

For example, the majority states that the evidence that Pearl traveled to Silverman's residence immediately after arriving at the airport on one of her cocaine-buying trips demonstrates little more than "mere" association. Maj. op. at 579. While the majority's view of this evidence as "innocent" is certainly a permissible one, it is not the only plausible explanation for Pearl's behavior. As previously observed, given the purpose of Pearl's trip to Van Nuys and her previous identification of her brother as her "source" for cocaine, it is not only plausible, but highly probable, that the reason she chose to visit her brother that evening was to obtain cocaine from him. Indeed, under the circumstances, it seems highly unlikely that a person on a cocaine-buying trip to California would interrupt her mission by paying a purely social call to a relative. In any event, the majority's analysis of this piece of evidence demonstrates no more than that there are two permissible views of it. It follows, then, that the district court's choice between them cannot be clearly erroneous. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511.

Similarly, the majority attempts to discount evidence that on the evening Pearl visited Silverman's residence, Silverman accompanied her when she returned to the airport, some two hours later, with five ounces of cocaine. The majority concludes that this evidence shows little more than that Silverman "was in the presence of a relative who was involved in a conspiracy." Again, while it is possible to infer from Silverman's presence on this occasion that he was simply "along for the ride," and that Pearl obtained her cocaine from some other source that evening, this inference is not the only plausible construction of this evidence. The evidence of Pearl's activities

*Bourjaily, see id.* at 2782; therefore, its conclusion that the district court's factfinding was not clearly erroneous binds us, even though the Court did not precede its statement with the words "We hold, therefore,...." I do not believe we are at liberty, as an appellate court, to impose a "plain statement" requirement on the United States Supreme Court.

that evening demonstrated that she traveled directly to Silverman's residence from the airport and returned with Silverman approximately two hours later. There was no evidence before the district court suggesting that she met with any person other than Silverman that evening. It is certainly possible that, after arriving at Silverman's residence, she obtained her cocaine from some other source, and that she then asked her brother to give her a ride back to the airport. However, it is just as reasonable to infer from this evidence that Silverman himself supplied the cocaine to Pearl. We thus have no basis for concluding that the district court's construction of this evidence is clearly erroneous.

The cases cited by the majority in support of its construction of the evidence offered by the government are inapposite. In *United States v. Weaver*, 594 F.2d 1272 (9th Cir.1979), for example, we held that Weaver's presence in a truck containing cocaine, standing alone, was not sufficient to establish his knowledge of and participation in a conspiracy to possess and distribute cocaine. *Id.* at 1274–75. However, we did not hold that such evidence had little probative value when considered along with other relevant evidence of a defendant's connection to a conspiracy. *Weaver* was decided under the pre-*Bourjaily* no-bootstrapping rule, which barred the district court from considering the challenged hearsay statements when assessing the weight of the foundational evidence offered by the government. Thus, the district court could not evaluate the evidence of Weaver's presence in the vehicle in the light of relevant hearsay evidence implicating him in the conspiracy. Indeed, in *Weaver* the *only* evidence, apart from the hearsay statements indicating that Weaver was in any way connected to the conspiracy, was his presence in the vehicle. Unlike the present case, there was no evidence suggesting that Weaver's co-conspirators regarded him as their "source" or attempted to contact him for the purpose of obtaining cocaine.

In contrast, in *United States v. Mason*, 658 F.2d 1263 (9th Cir.1981), we held that the government satisfied the foundational requirements of Rule 801(d)(2)(E) by introducing evidence that the defendant visited a co-conspirator on the night that a drug transaction took place. In *Mason*, DEA agents, hoping to apprehend a conspirator's "source," arranged a transaction with one of the co-conspirators and stationed themselves outside his house. The DEA agents testified that Mason was the only person to visit the house that evening. According to the agents, Mason drove up to the house, and, after a five-to-ten minute stay, drove away. Shortly thereafter, the occupant of the house told the DEA agents that he had the drugs, but that they were "hidden." The occupant then went outside the house and came back with a manila envelope containing cocaine. *Id.* at 1268–69.

We held that the observations of the DEA agents provided "a reasonable basis for supposing that Mason played, at a minimum, the role of the courier" in the conspiracy. *Id.* at 1269. We based this determination on the facts that the occupant of the house told an undercover agent that he expected a delivery from his "source" that evening, that Mason was the only visitor to the house on the night in question, and that the occupant shortly thereafter produced a manila envelope containing cocaine. *Id.* at 1268–69. Thus, although mere presence at the scene of a drug transaction may not be sufficient under *Weaver* to establish a defendant's involvement in a conspiracy to distribute cocaine, *Mason* establishes that evidence of presence, viewed in the light of other evidence, including hearsay evidence, suggesting the defendant's involvement in the conspiracy, may be sufficient to form the basis of an admissibility determination under Rule 801(d)(2)(E). *See also United States v. Fleishman*, 684 F.2d 1329, 1338 (9th Cir.) (evidence that defendants were present during negotiations and had repeated contact with conspirators sufficient under Rule 801(d)(2)(E)), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *United States v. Federico*, 658 F.2d 1337, 1343 (9th Cir.1981) (evidence that defendant was present at scene of drug transaction and drove others to rendezvous sufficient under Rule 801(d)(2)(E)), *over-*

*ruled on other grounds, United States v. De Bright,* 730 F.2d 1255, 1259 (9th Cir. 1984) (en banc).

Finally, the majority states that evidence that Silverman attempted to conceal his identity when confronted by DEA officials investigating the conspiracy was not evidence that Silverman knew of and participated in the conspiracy. In reaching this conclusion, the majority once again rejects a reasonable inference necessarily drawn by the district court. The majority states that the "uncontradicted evidence *suggests* that David Silverman concealed his identity in order to make arrangements through his attorney to surrender voluntarily rather than face possible arrest at his residence." Maj. op. at 582. Although this is a reasonable interpretation of the "uncontradicted evidence," it is certainly not the only inference "suggested" by the evidence of Silverman's two attempts to conceal his identity from the agents investigating his involvement in the conspiracy. In these circumstances, we are powerless to draw an inference, reasonable though it may be, which was necessarily rejected by the district court. *See Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511.

In conclusion, the majority's analysis permits this court, on the basis of a cold record, blithely to reject the district court's factual findings and reassess the probative value of the evidence presented to the district court. It is impossible to reconcile the majority's analysis of the evidence in this case with the rules guiding our review of the district court's factual determinations set forth in *Bourjaily* and *Anderson.* In addition, the majority's conclusion that the evidence offered by the government was insufficient to support the district court's findings flies in the face of even our pre-*Bourjaily* cases which acknowledge that circumstantial evidence of a defendant's involvement in a conspiracy may suffice to establish his connection to the conspiracy. I must, therefore, dissent.

## II

I must also dissent from the majority's holding that the district court erred in in-structing the jury that it may infer guilt from Silverman's attempt to conceal his identity from the DEA agents who attempted to question him at his home. The majority concludes that Silverman's concealment of his identity lacked sufficient connection to the criminal acts with which he was charged for a jury to infer his guilt. I disagree. I do not believe we have held, as the majority suggests, either that a defendant's attempt at concealment must immediately follow his last criminal act or that a defendant must be aware of the particular charges against him. *See* maj. op. at 581. Rather, our cases indicate that we have used a more flexible approach in determining whether the defendant's behavior supports an inference of guilt. *See, e.g., United States v. Tille,* 729 F.2d 615, 622 (9th Cir.) ("[t]he probative value of flight evidence depends on all the circumstances"), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). In so holding, we have also flatly rejected the argument that the government must prove that the defendant was "aware of the crime for which he was sought." *Id.* I see no need to depart from this "totality of the circumstances" approach in the case before us. There was sufficient evidence that Silverman's evasive conduct was prompted by fear of apprehension for the jury to infer his guilt. The jury was properly instructed and could determine whether the inference should be drawn in light of the other evidence before it.

Moreover, even if we were (mistakenly, I suggest) to adopt a test requiring either "immediate" evasive conduct or a showing that the defendant had some knowledge that he was suspected of the criminal activity that prompted his arrest, I believe that such a test has been satisfied here. While it is true that Silverman did not attempt to conceal his identity until "two months after Pearl's last trip to Van Nuys," *see* maj. op. at 582, this fact does not necessarily indicate that an "immediacy" test is not met in the present case. Silverman had no reason to conceal his identity at the time of that transaction—the drug enforcement agents did not approach him at that time and he

had no reason to fear that he was suspected of involvement in the drug conspiracy. However, Silverman did "immediately" attempt to conceal his identity when questioned by drug enforcement agents at his residence. Silverman instinctively reacted to the possibility of apprehension by concealing his identity, which is all that is required to demonstrate "immediacy." *See, e.g., United States v. Feldman,* 788 F.2d 544, 555 (9th Cir.1986) ("It is the instinctive or impulsive character of the defendant's behavior ... that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses."), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987), *quoting United States v. Myers,* 550 F.2d 1036, 1051 (5th Cir.1977), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978).

In addition, the majority's assertion that Silverman's attempt at concealment occurred after a "two-month delay" is erroneous. Silverman was not charged merely with isolated acts of supplying cocaine. He was charged with an ongoing conspiracy. It is difficult to ascertain when his "last criminal act" occurred. Where, as here, the "criminal act" is an ongoing affair, an act of concealment which occurs during or within a reasonable time after the conspiracy and which is directed toward law enforcement agents investigating the crime clearly satisfies a requirement that the conduct be "immediate" to the crime.

I must also disagree with the majority's conclusion that no evidence suggests that Silverman knew of the accusations against him. Silverman did not know, to be sure, that he ultimately would be charged with conspiring to deal cocaine in violation of federal law. It is fair to say that most criminals are similarly ignorant about the particular charges they will face, if caught. For this reason, it does not make sense to require that a defendant know of the particular accusations against him as a prerequisite to finding that his evasive conduct supports an inference of guilt of the crime charged. *See* maj. op. at 582. Rather, it is sufficient that the defendant have reason to believe he is suspected of the criminal activity that ultimately led to his arrest.

While it is possible, as the majority maintains, *id.* at 581, that Silverman's evasive conduct was prompted by fear that he was suspected of some other drug-related conduct, we have never conditioned the admissibility of flight evidence on the government's ability to rule out every hypothetical suggested by the defendant. Every instance of flight is susceptible to more than one interpretation. A person caught fleeing from a store or bank in which an armed robbery has taken place is free to argue to the jury that he was merely an innocent bystander concerned for his safety. However, the possibility that a flight has an innocent explanation has never been a bar to its admissibility.

Applying the proper standard to the present case, it is clear that Silverman's evasive conduct was prompted by fear that he was suspected of involvement in drug-related activities. Silverman attempted to conceal his identity the moment he had reason to believe that he was suspected of involvement in the cocaine conspiracy, that is, when the DEA officials confronted him at his residence. It is significant that Silverman again gave a false identity later that afternoon, after the agents left a message with him to call the DEA to answer some questions. The agents in question were not local police officers, but *Drug Enforcement Agency* officials, who identified themselves as such. Their presence at Silverman's residence, their expressed interest in questioning Silverman, and their return to his residence later that day, surely indicated to Silverman that he was suspected of involvement with illegal drugs, and by the federal government, at that.

In conclusion, Silverman's attempt to conceal his identity from DEA officers, when viewed in light of other evidence suggesting his guilt, clearly is sufficient to support the inference that Silverman was conscious of his guilt concerning the activity that led to his arrest, even under the majority's ill-advised new rule. I must therefore disagree with the majority's conclusion that the district court erred in instructing the jury that it might infer guilt from Silverman's false statements to the

DEA agents. For the same reasons, I dissent from the majority's holding that the district court was barred from considering this evidence when making its admissibility determination under Rule 801(d)(2)(E).

I would affirm Silverman's conviction.